DR. JACK KAHN v. HARRIS, UPHAM & COMPANY.

No. A-3635. Decided November 26, 1952.
Rehearing overruled January 14, 1953.
(253 S. W., 2d Series, 647.)

*R. H. Cory,* of Victoria, *Fred W. Moore* and *Raymond M. Hill,* both of Houston, and *Powell, Wirtz & Rauhut,* of Austin, for petitioner.

Cotton futures contracts are not valid unless they comply with the provisions of the U. S. Cotton Futures Act, as provided by Article 657 Texas Penal Code. Franke v. Murray, 248 Fed. 865; Kokernot v. Caldwell, 231 S. W. 2d 528; City of Wewoka v. Rodman, 172 Okla. 630, 46 Pac. 2d. 334.

*Guittard & Henderson,* of Victoria, *Andrews, Kurth, Campbell & Bradley, James R. Connor* and *Richard Burns,* all of Houston, for respondent.

MR. JUSTICE WILSON delivered the opinion of the Court.

The parties will be identified as in the trial court.

The price of cotton fell during October of 1946 resulting in a loss in the purchase and resale of 700 bales of "December" cotton. This suit determines whether that loss falls upon the cotton broker or upon his customer.

Defendant, Dr. Jack Kahn of Victoria County, is alleged to have purchased 7 separate contracts of cotton (each 100 bales) on October 15th and 16th of 1946. Two of these contracts were sold by the plaintiff broker on the following day (October 17th), and the other five were sold five days later (October 21st) for a loss of approximately $11,577.50. Defendant contended that he did not authorize the transaction, but the jury found against him on this point. The trial court has entered a judgment for plaintiff in the amount of its damages with interest. This has been affirmed by the Court of Civil Appeals in an opinion reported at 247 S. W. 2d 139.

Plaintiff, Harris, Upham & Company, a member of the New Orleans Cotton Exchange, is a duly registered and licensed broker in Texas.

Defendant contends that the contracts sued upon were illegal for the reason that they are sales of cotton "futures" not made with the intention to make actual delivery, but rather with the intention of speculating on the cotton market.

Arts 656-664 of the Penal Code prohibit "Bucket Shops". Under Art. 657 it must be "contemplated" by the parties at the time of sale that there will be an "actual delivery" of the cotton. Under Art. 658, any futures contract is void where two circumstances concur which are, first: where there is no "bona fide intention" to deliver the commodity; and second, where there is no "actual bona fide execution" and "carrying out" of the sale upon the floor of an exchange.

Whatever their precise meanings and differences may be, the words "contemplate * * * an actual delivery" found in Art. 657 are not the same as the words "bona fide intention" to deliver found in Art. 658. Art. 658, a felony, is directed at what is commonly called a "bucket shop," i.e. a place where no sales are actually consummated but instead the parties gamble on the rise and fall in a bona fide and different market. Art. 657 does not define a criminal offense and is not aimed primarily at "bucket shops" but validates "futures contracts" made as genuine sales on a bona fide exchange and clearly exempts them from the operation of the penal laws. The Legislature recognized a distinction between a contract which contemplated an ultimate delivery of cotton to the holder at maturity and a contract "where it is not the bona fide intention of parties that the things mentioned therein are to be delivered" but instead of delivery it "is to be settled according to or upon the basis of public market quotation * * *."

The invoice from plaintiff to defendant covering each sale or purchase contained the following words:

"It is understood that the within and all other transactions made for your account by us contemplate actual receipt and delivery of the property and payment therefor and that all property sold for your account is sold upon the representation that you have same in your possession actually or potentially."

The uncontroverted evidence established that a "futures contract" is a present purchase of cotton at current market price for delivery at a fixed place and time in the future. By its very nature it does "contemplate" a delivery of a specific amount of cotton at a future date. The fact that either party to the same or both may know that the purchaser intends to sell before delivery date and has no intention at the time of purchase of keeping the contract until maturity does not keep it from being "contemplated by the parties thereto that there shall be an actual delivery." The purchaser may decide to keep the contract. If he does

keep it, there will be delivered to him the specific amount of cotton at a definite time and place. Morgan v. Rose, 62 S.W. 2d 1022:

Defendant plead that one Jim Allen, a customer's man for plaintiff, who had theretofore sold him certain stocks and bonds, suggested that the time was good to purchase cotton futures and that by the purchase of cotton futures defendant could make "some easy and quick money"; that he, defendant, was not interested in purchasing cotton futures, but that the said Allen insisted and represented that the margin rates on cotton futures had been lowered subsequent to June 30, 1946, and were much lower than comparable margin rates for the purchase of stock; that Allen on October 15, 1946, told the defendant that he was going to purchase for defendant 100 bales of cotton which purchase he, the defendant, refused to authorize; that notwithstanding the absence of an authorization Allen, on October 15, 1946, advised defendant that he had purchased 100 bales for the account of defendant; that defendant protested but Allen insisted; that shortly afterward the price of cotton declined and such fact was made known to defendant.

"* * * and he thereupon authorized the said Jim Allen to purchase two additional contracts of cotton for defendant. Defendant, however, specifically instructed Allen to sell the three contracts of cotton so purchased on the day trade. In clarification, it is stated that 'day trade' in the parlance of stock brokers means that any stocks or commodities purchased on a given day shall be sold on the same day that such stocks or commodities were purchased. That Allen, in complete disregard of the instructions of defendant, as aforesaid, refused, for reasons unknown to this defendant, to sell the three contracts of cotton so purchased on the day trade basis, that is to say, that said Allen did not sell the three contracts of cotton before the close of the market on October 15, 1946.

"That on October 16, 1946, the said Allen again communicated with defendant, and advised defendant that the cotton market would soon stabilize itself, and that he would make additional purchases of cotton for defendant so that the losses sustained on the previous day could and would be recovered. That defendant advised Allen at that time that he did not desire to purchase any additional contracts of cotton, and, inasmuch as Allen had disregarded defendant's specific instructions to dispose of the cotton purchased on October 15, 1946, on a day trade basis, that all cotton held by Allen to defendant's account was held by Allen at Allen's own risk and expense; and

further, that no additional purchases of cotton contracts were desired by defendant or authorized by defendant, and that defendant did not thereafter authorize Allen, or any other agent, servant, or employee to plaintiff, or plaintiff, to purchase any other contracts of cotton."

Defendant's claim that the purchases were unauthorized has been determined against him by an adverse jury verdict not attacked on appeal.

Art. 658 has no application to the case at bar because the above pleadings and undisputed evidence established that the "futures" were bought and sold on the floor of the New Orleans Cotton Exchange. Although much of this evidence may have been subject to objection, and much of it was objected to, the Court of Civil Appeals has found that enough was admitted without objection to establish the point even if it is put in issue by the pleadings.

1 On the point of delivery, a fair summation of defendant's pleading is that Allen suggested that the defendant speculate on the cotton market by buying "futures" and that some of the "futures" were to be sold on the same day or several days after they were purchased. Defendant did not plead that the plaintiff had no intention of executing the contract by purchasing cotton "futures" on the New Orleans market, or that the contracts were to be shams rather than actual purchases. Defendant does not charge plaintiff with operating a "bucket shop." What he does plead is that neither party intended that he should hold the "futures" until maturity date. He argues that he had no need for cotton and that the whole transaction was a pure speculation. This is immaterial. Had he kept the futures and paid for them the cotton would have been delivered.

We conclude that on the face of the pleadings and from the uncontroverted evidence these contracts were not condemned by Art. 657 for the reason that an actual delivery of cotton was to be made upon maturity. Palmer v. Love, 18 Tenn. App. 579, 80 S.W. 2d 100.

Defendant contends that the contracts are illegal and cannot be the basis of a recovery in the Texas courts because not "signed by the party to be charged, or by his agent in his behalf." He asserts that Art. 657 incorporates by reference the U.S. Cotton Futures Act (Title 26, U.S.C.A. 1920) and thus makes a contract violating it invalid in Texas.

We overrule the contention. Art. 657 of the Penal Code validating futures contracts, contains the following clause:

"* * * provided, that contracts of sale for future delivery of cotton in order to be valid and enforceable as provided herein, must not only conform to the requirements of clauses 1 and 2 of this section, but must also be made subject to the provisions of the United States Cotton Futures Act, approved August 11, 1916, and any amendments thereto; provided, further, that if this clause should for any reason be held inoperative, then contracts for the future delivery of cotton shall be valid and enforceable if they conform to the requirements of clauses 1 and 2 of this section; * * *."

A statute can incorporate by reference other legislation if the Legislature so intended, but when it does so it is generally considered as a borrowing of "outside" language.

Did the Legislature intend to incorporate the entire language of the "United States Cotton Futures Act, approved August 11, 1916, and any amendments thereto" into the Texas Act? Obviously not. The language of the entire Federal Cotton Futures Act cannot be made to fit into Art. 657. The two Federal penalties for violation are that a contract shall be taxed at a rate of 2 cents per pound and shall not be enforceable in any court of the United States. It could not be contended that the tax provided for a violation of the Federal Act could be collected by the State of Texas. The Texas Legislature manifested no intention to impose an additional state tax of 2 cents per pound for a contract not in writing and not signed by the parties. It would take a substitution of the words "Texas Courts" for the words "Federal Courts" in the language sought to be incorporated in order to give Art. 657 the meaning defendant asserts. The Act provides that in order to be valid a futures contract must "not only conform" to other provisions of this statute but "must also be made subject to" the provisions of the Federal Act. The Legislature did not say that a contract shall "conform to" the provisions of the Federal Act authough it used those very words in another part of the same sentence. "Conform to" and "subject to" have a different meaning. Ft. Worth & Denver City Ry. Co. v. Masterson, 95 Texas 262, 66 S.W. 833; Engelstein v. Mintz, 345 Ill. 48, 177 N. E. 746.

2  Then does a violation of the Federal Act make a futures contract invalid in Texas? A state statute requiring that contracts "be made subject" to the provisions of a general Federal

act is surplusage in so far as it amounts to an attempt by a state to control the application of a Federal law. The contracts at bar would be subject to the Federal law without this provision. It is not within the power of a state to exempt them from the operation of a Federal law.

It is not necessary for us to pass upon the question of whether the contract at bar is a violation of the Federal act and subject to the Federal penalties.

3 We hold that Art. 657 of the Penal Code did not incorporate the United States Cotton Futures Act into itself, and specifically that Art. 657 does not itself require that futures contracts be in writing and signed by the party to be charged.

Section 1920 of the Federal Cotton Futures Act limits the 2 cents per pound tax to contracts made on an "exchange, board of trade, or similar institution or places of business." We have not examined the question of whether in other states, in the absence of a prohibition, it is possible for there to be a legal cotton futures contract not made on an exchange and therefore not subject to the Federal tax. It is not necessary that we go further in determining the exact meaning of the words "subject to" in Art. 657. The Fedaral act contains many definitions of technical terms used in cotton grading and trading, and establishes administrative machinery to govern certain aspects of cotton trading. See Sec. 1926. Therefore we limit our holding on this point to the precise question of whether Art. 657 itself requires a cotton futures contract in Texas to be in writing. Neither do we pass upon questions arising out of the clause "made in accordance with the rules of any board of trade, exchange, or similar institution" for the reason that defendant does not allege a violation of the rules of the New Orleans Cotton Exchange. Rule 94, T.R.C.P.

The judgments of the trial court and of the Court of Civil Appeals are affirmed. Costs are taxed against petitioner (defendant below).

Opinion delivered November 26, 1952.

Rehearing overruled January 14, 1953.