UNITED BROADCASTING COMPA-
NY, INC., U. B. C. Sales, Inc., and
their officers and Richard Eaton,
Plaintiffs-Appellants,

v.

Jay J. ARMES, Defendant-Appellee.

No. 73–3824.

United States Court of Appeals,
Fifth Circuit.

Jan. 20, 1975.
Rehearing Denied Feb. 10, 1975.

J. F. Hulse, Stephen B. Tatem, Jr., El Paso, Tex., for plaintiffs-appellants.

Marshall I. Yaker, H. Tati Santiesteban, El Paso, Tex., for defendant-appellee.

Before GEWIN, GOLDBERG and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge:

In this Texas diversity case we must interpret a series of oral and written contracts for personal services undertaken and performed in the context of a most extraordinary set of facts. Plaintiff Richard Eaton and two corporations of which he is president appeal from a judgment for $80,000, plus court costs, entered on a jury verdict in favor of defendant and counterclaimant Jay Armes. We affirm.

## I. Factual Background to the Dispute

### A. The Relationship Between Eaton and Estella Vega Padilla

Richard Eaton is a Washington businessman who is president and sole stockholder of United Broadcasting Company and its wholly owned subsidiary, U.B.C. Sales, Inc. In 1964 Eaton met Francisco Nunez, who owned radio station XEWG in Juarez, Mexico. Eaton wanted to buy the station but learned that under Mexican law, American citizens cannot own property or government broadcast licenses in Mexico. Eaton was accompanied by Estella Vega Padilla, his close friend at that time and later his housekeeper. She is a Mexican citizen and suggested that Eaton register the title to the station and broadcast license in her name. Between the time of this purchase and 1970, Eaton loaned Estella Vega Padilla approximately $450,000 to operate XEWG and several other Mexican stations. This loan agreement, according to Eaton's statement in his deposition, was not reduced to writing until December of 1971.

At about the same time that radio station XEWG was purchased by Eaton and put in Estella Vega Padilla's name, Eaton was arranging the adoption of a child by his son and daughter-in-law. He urged the couple to adopt a child, in the hope that it would revive their failing marriage. On the advice of a Miami doctor, he arranged for the adoption of a child about to be born out of wedlock to a young woman who felt she could not keep the child. At the last minute, Eaton's son and daughter-in-law decided not to go through with the arrangement. The baby had already been delivered, and so Eaton assured his daughter-in-law that he would care for the child himself. He persuaded Estella Vega Padilla to assume day-to-day responsibility for the child, which she did.

In March 1970, because of a dispute over the profits from the radio station, Estella Vega Padilla left Eaton and headed for Mexico with the child.

### B. The Contracts Between Eaton and Jay Armes

Eaton then sought the services of defendant Armes, a private investigator in El Paso, Texas. On April 29, 1970, he and Armes concluded an agreement pursuant to which Armes was to recover the child for a fee of $1,500. Eaton had information at this time that the child was in Juarez, Mexico. Armes learned, however, that the child was in Veracruz. When Armes told Eaton of his discovery, the two entered into a second agreement, this one oral, pursuant to which Armes was to recover the child in Veracruz. Further, he was to recover for Eaton all the properties Eaton had entrusted to Estella Vega Padilla: radio station XEWG in Juarez, Mexico, radio station XESM in Mexico City, and a house in Chevy Chase, Maryland. Armes testified that Eaton told him that XEWG had been sold for $400,000, out of which Armes would be paid $80,000 as soon as the necessary papers were procured and executed.

For nearly a year thereafter, Armes worked on his assignment from Eaton. The child was returned by Armes to Eaton in October 1970. By March 1971, Armes had completed most of the arrangements for the return of Eaton's property. As a result of Armes' efforts, Estella Vega Padilla was extradited from Mexico City to Juarez. Armes initiated proceedings against her for criminal fraud. Faced with the serious threat of prosecution, Estella Vega Padilla sought to make amends. She executed a power of attorney authorizing a lawyer in Juarez, Mr. Vargas, to transfer the radio stations to another Mexican party. Armes also recovered from Estella Vega Padilla the deed to the Maryland house that Eaton had entrusted to her.

On March 6, 1971, Eaton and Armes concluded a third agreement, this one written, which recited that when Armes turned over the deed to the Maryland property and the papers necessary for the transfer of the radio stations, XEWG would be sold within thirty days and 20

per cent of the proceeds would be given to Armes in payment for his services. After delivering the documents sought by Eaton, Armes demanded his fee. A dispute developed over the agreements, and Armes filed suit in Juarez, intending to levy on the assets of the radio station (XEWG). Eaton filed suit in the United States District Court, Western District of Texas, and obtained an injunction against Armes' suit in Juarez. Armes counterclaimed for his fee. The jury returned a verdict in favor of Armes, and the court entered a judgment of $80,000 plus court costs, from which Eaton has appealed.

II. Plaintiff Eaton's Contentions on Appeal

A. The Meaning of the Agreements

■ The jury found, in answer to a special interrogatory, that Eaton agreed to pay Armes $80,000 plus expenses for his services. Eaton contends the jury's verdict is contrary to the express terms of the written contract of March 6, 1971, which, he asserts, is a reduction to writing of all the agreements between the parties. He argues, therefore, that any prior oral agreements are barred by the parole evidence rule and doctrine of merger. We have summarized the facts in some detail, but it is clear that there is a conflict in substantial evidence sufficient to create a jury question, see Boeing Company v. Shipman, 5 Cir., 1969, 411 F.2d 365, 374–375 (en banc), and that the jury resolved that conflict adversely to defendants.[1]

■ It is apparent from all the testimony that the earlier oral agreements concerned several matters not mentioned in the written contract of March 6, 1971, most conspicuously the recovery of the child, which proved to be far more difficult than either party anticipated when they negotiated the original contract on April 29, 1970. Armes also performed services for Eaton subsequent to and not covered by the written agreement of March 6, 1971. For example, Armes testified that after he had completed all his obligations under the written contract, Eaton sent him back to Juarez for a duplicate title to the property in Maryland, one deed for which Armes had already delivered. Whatever the written agreement may provide concerning Armes' fee for the services listed therein, Eaton's promise to pay Armes $80,000 for the entire job survives from the prior oral agreement.

■ Eaton also complains of the jury's answer to a special interrogatory that station XEWG was in fact sold for $400,000. In light of our conclusion that the jury was correct in finding that Eaton promised Armes $80,000 for his services, the amount for which the radio station was sold does not affect Armes' rights under the contract. Nor is Armes' recovery dependent on whether the station was actually sold. Although the sale of the radio station was mentioned in the oral agreement, Eaton's oral promise to pay $80,000 for Armes' services was not tied to any specific proceeds. The promise given by Eaton in the March 6, 1971 written agreement merely identified one source of payment on which Armes could depend for compensation for his work. The sale of the station was part of Eaton's obligations under that agreement, not a condition precedent to those obligations. If Eaton failed to sell the station he breached the agreement just as surely as if he had sold the station but refused to give Armes any of the proceeds.

■ Moreover, there is evidence in the record that a sale did take place. Armes testified that Eaton told him the station had been sold to a Mexican company called Escarga, represented by Jesus Hernandez Gutierrez. The record includes a sale contract reciting that Gutierrez is to pay $400,000 to Richard Eaton for radio station XEWG, and that U.B.C.

---

1. Under the circumstances, the district judge was fully justified, and did not abuse his discretion, in denying Eaton's motion for a new trial. See, e. g., United States v. Bucon Construction Company, 5 Cir., 1970, 430 F.2d 420, 423; Powell v. McIntire, 5 Cir., 1969, 415 F.2d 333.

Sales, Inc. is to hold a promissory note in that amount until full payment is received. The record also contains a statement executed by Gutierrez, as owner of XEWG, authorizing the payment of all monies due the radio station to U.B.C. Sales, Inc. Despite the confusion surrounding the disposition of the radio station, there was ample evidence to support the jury's finding that the station was sold and that Eaton received the proceeds.

### B. Errors Alleged to Have Been Committed at Trial

Eaton also assigns as error the following actions by the trial court: (1) refusal to exclude expert testimony and other evidence concerning the value of the radio station; (2) instructions to the jury that adverse inferences could be drawn from the failure of Eaton and Estella Vega Padilla to appear and testify; (3) refusal to permit the reading of Eaton's pretrial deposition on the question whether he was too ill to appear; (4) instructions to the jury that the widespread occurrence of bribery and other misconduct in Mexico could be taken into account in considering the effect of Armes' misconduct on his credibility as a witness; (5) entry of an injunction by the district court against Eaton to restrain him from proceeding in a suit against Armes by Eaton for invasion of privacy in Washington, D. C. All of these contentions are without merit.

■ *1. The expert testimony.* In light of our conclusion that Armes' compensation was not dependent on the amount of proceeds from the sale of the radio station, whatever error may have been committed in allowing testimony on the value of the station was harmless.

■■ *2. Failure of Eaton and Padilla to appear.* The trial judge instructed the jury that, if they found Estella Vega Padilla had knowledge of the facts in the case and was reasonably available to Eaton and less available to Armes, they could infer that her testimony would have been unfavorable to Eaton. This standard instruction was proper. C.

McCormick, Law of Evidence § 249 at 534 (1954). The trial court obliquely suggested to the jury that the same inference could be drawn from Eaton's failure to appear, noting that the court had concluded there was no medical reason for Eaton's refusal to travel to El Paso. The instruction itself is a standard charge on credibility. See C. McCormick, *supra,* § 249; Wigmore on Evidence § 289 (1940). The trial judge's finding that Eaton was in fact able to appear is amply supported in the record.

■ *3. The reading of Eaton's deposition.* The trial court initially acceded to Eaton's request, supported only by a physician's unsworn statement, that he not be required to attend the proceedings in El Paso for health reasons. See Fed.R.Civ.P. 32(a)(3)(C). During the taking of the deposition, however, Armes' counsel elicited from Eaton the admission that he travelled frequently by airplane on business matters. Moreover, Eaton used the occasion of Armes' attendance at the deposition to serve him with the complaint in Eaton's Washington lawsuit for invasion of privacy. These developments cast serious doubts on the validity of Eaton's earlier claim of physical incapacity. Thus when Eaton's counsel attempted to blunt the effect of his client's failure to appear by reading to the jury the portion of Eaton's deposition concerning his health, the trial court properly limited the testimony. Considering the facts elicited in the deposition about Eaton's physical capacity and Eaton's numerous business trips between New York and Washington, the court was fully justified in its ruling and we perceive no reversible error.

■ *4. The trial court's comments concerning bribery.* During plaintiff counsel's closing argument and in the instructions to the jury, the trial judge expressed his belief that Armes' use of bribery and other questionable practices in connection with the return of Eaton's property should be viewed in light of the prevalence of such practices in Mexico. The trial court made it clear that the

jury was not to take his comments as approval of Armes' actions. These comments were part of the trial judge's instructions to the jury concerning the importance of assessing the credibility of witnesses.[2] Taken in context, the trial court's observations were nothing more than an attempt to inform the jury that they should consider all the circumstances in assessing the impact of an illegal act on Armes' credibility.[3] We find no error in his comments. See Byrd v. Blue Ridge Rural Electric Cooperative, 356 U.S. 525, 540, 78 S.Ct. 893, 902, 2 L.Ed.2d 953 (1958).

5. *The injunction against Eaton's suit in Washington, D. C.* The trial court enjoined Eaton from further proceeding in his suit against Armes in Washington for invasion of privacy and other torts. His judgment was obviously correct. Fed.R.Civ.P. 13(a) in pertinent part states:

> A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim . . . . .

Eaton's Washington suit alleges that, in connection with the collection of his fees, Armes made a number of threats to harm Eaton and the child, including a threat to kidnap the child and take her back to Mexico. Thus this claim clearly arises out of the same transaction as Armes' claim in the present suit and should have been pleaded as a counterclaim in the Texas federal court.

Affirmed.

---

2. Eaton's counsel conceded at oral argument in this Court that he was not relying on alleged illegality of the contracts between Eaton and Armes. Inquiry into possibly illegal acts connected with these contracts is foreclosed by state law, which we are bound to follow in this diversity case. Under Texas law, if a contract is not illegal on its face, its illegality must be raised. as an affirmative defense. Kahn v. Harris, Upham & Co., Tex.Civ.App., 1952, 247 S.W.2d 139, 142, aff'd, 151 Tex. 655, 253 S.W.2d 647; City of Galveston v. O'Mara, Tex.Civ.App., 1941, 146 S.W.2d 416, 420, aff'd sub nom., City of Galveston v. Heffernan, 138 Tex. 16, 155 S.W.2d 912. Plainly this contract called for no illegal acts, either

implicitly or by its terms, and illegality was not raised as an affirmative defense in the trial court.

3. The trial court's charge, in relevant part, was as follows:

> . . . I thought that Mr. Gonzalez Vargas said that this is the way, referring to the mordida [a Mexican idiom for bribery], that this is the way business is done over there.
> Well, of course, certainly [sic] isn't right over here, and we know that, and I don't think anybody would personally approve of matters being made that way. But listen to all the testimony.