**MJR CORPORATION, Mike Murphy, John Woodruff, Furrh Vending Corporation, d/b/a Quality Vending Company, and Don Furrh, Appellants,**

v.

**B & B VENDING COMPANY, Appellee.**

No. 05–86–00539–CV.

Court of Appeals of Texas, Dallas.

Aug. 30, 1988.

Rehearing Denied Oct. 6, 1988.

**6**

Royal H. Brin, P. Michael Jung, Mark M. Donheiser, Dallas, for Mike Murphy, John Woodruff and Furrh Vending Corp., d/b/a Quality Vending Co.

Patrick C. Guillot, Karen Washington, Dallas, for Don Furrh.

Larry F. Amerine, Rick Hightower, Warren D. Campbell, Dallas, for appellee.

Before HOWELL, McCLUNG and McCRAW,[1] JJ.

HOWELL, Justice.

This is a suit over the right to install and receive revenues from coin-operated vending machines and coin-operated game machines located in certain bars, lounges and nightclubs. Pleading both contract and tort, plaintiff, B & B Vending Company ("Old Vendor," or simply "Vendor") recovered a judgment against defendant, Furrh Vending Corporation, d/b/a Quality Vending Company ("New Vendor"), and related parties for forcibly excluding the machines of Old Vendor from ten different clubs and replacing them with machines of New Vendor. We find the judgment in error with respect to five clubs. Inasmuch as the damages were awarded in the aggregate, we find it necessary to reverse and remand the entire case for new trial.

### FACTS

The parties were all well acquainted and had done business with one another for a number of years. B.H. Williams was the president of Old Vendor.[2] Defendant Don Furrh, acting individually and through various corporations and partnerships, was a club operator. Defendant MJR Corporation and its principals, defendants Mike Murphy and John Woodruff, were also club operators. At the time this action arose or slightly before, Vendor had its machines installed in each of the ten clubs involved in this case. Vendor asserted the exclusive right to install machines in defendants' clubs for varying periods of years by reason of a series of written agreements, each pertaining to an individual club. Desiring to enter the coin-machine business themselves, the individual defendants organized New Vendor and acquired the necessary permits and equipment. During a short period commencing in February 1984, defendants caused Vendor's machines to be excluded from each of the ten clubs. Vendor then brought this suit for breach of contract joining the co-defendants just named through pleas of conspiracy and tortious interference. In a non-jury trial, the court below found in favor of Vendor on all theories and entered a joint and several judgment for $842,938.01 in lost profits plus exemplary damages in the same amount plus $45,995.50 in attorneys' fees for a total of $1,740,872.52.

The relationship between Vendor and defendant club operators was complex. Coin-operated machines were Vendor's main line

---

1. The Honorable John L. McCraw, Justice, participated in the submission of this case and in subsequent deliberations. However, he was no longer a member of the Court at the time of the opinion and judgment herein. The remaining members of the submission panel being in agreement, this opinion is delivered by them as the decision of the Court.

2. He died during the trial, and his deposition was read in evidence.

of business. The established practice of the parties was to execute a printed form agreement provided by Vendor. Such contracts were each entitled "Location Agreement." However, the agreements referred to the parties as "lessor" and "lessee," and followed the customary language of a lease except that they recited that the respective "lessors" were demising "a location upon ... [premises identified or described] for the purpose of installing and operating coin-operated machines...." Each agreement further provided that during the term, lessee was granted "the exclusive right ... to install and operate such machines...." The forms, as printed, provided for a term of five years, but in certain instances, a shorter term was interlineated. The agreements contemplated that Vendor would service and maintain the machines, would fill them with merchandise, and would empty the coin boxes. They further provided that Vendor would remit to the club operator a percentage of the gross receipts, after deduction of taxes, the agreements generally calling for the club to receive five percent on cigarette machines and fifty percent on game machines.

In connection with its coin-machine business, Vendor engaged in the business of providing financing to bars, lounges and clubs. Undoubtedly, Vendor's willingness to finance the operators of such businesses gave to it an entree to secure the execution of location agreements. Banks and other commercial lenders often look askance upon such entities as suitable loan customers. For their part, club operators, when desirous of a loan, were entirely willing to sign five-year agreements granting exclusive rights to provide machines for their establishments.

Even though the agreements were generally drawn for five-year terms, they were rarely, if ever, enforced whenever an operator sold or closed his establishment. Businesses of this type change hands frequently. In such instances, it was the habit of Vendor to approach the new operator and attempt to secure the execution of a new five-year agreement, often offering or providing financing to the new operator. Upon execution of a new agreement by the new operator, the previous agreement was promptly forgotten. If the successor operator failed to sign a new agreement, Vendor rarely took any recourse except to remove its machines.

It appears that, at least in certain instances, Vendor also provided advice and counsel to the defendant operators general business, along with assistance in the drawing of legal instruments. During July 1983, the three individual defendants, Furrh, Murphy, and Woodruff went to the offices of Vendor and had a conversation with President Williams. Following the discussion, a secretary in that office prepared two lease agreements covering establishments known as "Geno's" and "Baby Dolls." These instruments were not simply "Location Agreements"; they were true leases of the premises described, executed on commercial printed lease forms. Each was for a term of fifteen years. The lessor in each instance was defendant Furrh and an affiliate corporation; the lessee in one was defendant MJR; in the other, an MJR affiliate. After the instruments were executed, they were notarized by Vendor's general manager.[3]

Vendor was not a formal party to these leases, either as lessor or lessee. Why the transaction was completed at the office of Vendor is problematic, except for the supposition that Vendor desired to accommodate these club operators with whom it did considerable business by assisting in the drafting and execution of legal papers. Of particular significance to this case, each form lease agreement, as it was drafted, presumably by Vendor, and as it was signed by the parties, contained the following typewritten provision:

> [Vendor], as a part of this lease, is granted the right to place all vending machines and/or coin operated machines on these premises.

3. Vendor's machines already had been on location at both of these clubs for a considerable period. Also, MJR had been operating both premises for a substantial time. The leases executed on this date apparently renewed or memorialized a pre-existing arrangement.

Following execution of the two leases, according to the testimony of the three individual defendants, the three of them took an automobile trip to the country. While on the trip, defendant Furrh made known to co-defendants Murphy and Woodruff that he planned to go into the coin-machine business in competition with Vendor and had already secured a corporate charter and a permit for such an endeavor. An agreement was reached for Murphy and Woodruff to join the new company, each owning approximately one-third of the stock. The following day, entirely new leases for Geno's and Baby Dolls were executed,[4] the only significant change in the terms being that the name of Old Vendor was deleted and the name of New Vendor was substituted causing each lease to recite that New Vendor was granted the right to place all coin-machines on the respective premises.

During the following seven months, Vendor's machines remained in place at all ten clubs; business relations between Vendor and defendants remained undisturbed.[5] During that period, however, New Vendor quietly acquired enough coin-machines to meet the clubs' needs. Finally, during a brief period commencing on February 4, 1984, defendants excluded all of Old Vendor's machines from their clubs, unceremoniously hauling most of them to a warehouse and installing the machines of New Vendor. Vendor had no inkling of defendant's intentions until notified that it should retrieve its machines from the warehouse and elsewhere.

After filing suit, Vendor sought discovery of New Vendor's records showing the revenues and expenses realized by New Vendor's machines at the ten locations. New Vendor failed to provide the information. The court finally entered an order that inasmuch as the information sought by Vendor had not been provided, defendants would be forbidden to introduce any such information at the trial.

In order to prove damages, Vendor called a professor of economics and econometrics from a university in the area who presented extensive data. Basically, he took Old Vendor's records of receipts from each location, deducted expenses and an overhead allowance to reach a net estimated weekly income figure, and projected this figure forward to the expiration of the term of each lease and location agreement. These calculations were then discounted by an interest rate thought by the expert to be appropriate in order to present a net present lump sum value of the estimated future income stream.[6] Following this methodology, the expert arrived at the following estimate of discounted lost profits which we divide into groups:

| Group One | Unexpired term in Weeks | Discounted Lost Profits |
| --- | --- | --- |
| Geno's | 688 | $415,560 |
| Baby Dolls | 688 | 394,205 |
| Babe's | 216 | 48,887 |
| Fantasy Island | 216 | 145,234 |
| Cuddles | 160 | 46,379 |
| | | 1,050,265 |
| Group Two | | |
| Baby Doll's Topless | 164 | 110,721 |
| The Fare | 176 | 91,180 |
| Lakeside | 44 | 16,968 |
| Don's Showtime | 164 | 61,863 |
| Youngblood's | 160 | 76,324 |
| | | 357,056 |
| Discounted Total | | 1,407,324 |

The trial court made a single finding of actual damages in the amount of $842,938.01 which, after a forty percent reduction, closely approximates the expert's estimate just quoted. The court did not disclose its methodology, simply announcing

4. The date and circumstances whereby these new leases came into existence lie exclusively in the testimony of the individual defendants. They bore no acknowledgements; no others testified concerning their execution. The parties continued to utilize Old Vendor's machines already in place on both premises. The existence of these new leases was not made known until during the trial.

5. Defendants Woodruff and Murphy even borrowed money from Vendor in order to remodel one of the clubs.

6. For the period of weeks from the February 1984 exclusion date to the time of trial, interest was accrued instead of applied as a discount.

that it had "made a substantial discount" from the evidence presented.

Furrh presents thirty-six points of error; the remaining defendants, appealing jointly, present thirty-three points, many of them overlapping Furrh's points. Most of the points challenge the legal and factual sufficiency of the evidence.[7] We sustain the contentions that, as a matter of law, defendants' conduct in excluding Vendor's machines from Baby Dolls, Geno's, Babe's, Fantasy Island, and Cuddles was not actionable, at least in part.[8] With respect to the five remaining clubs, we find evidence of actionable conduct. However, for reasons to be explained herein, we cannot adequately segregate the damage awards, actual and exemplary. We therefore reverse and remand generally. We also address certain matters likely to occur on re-trial.

## THE CLAIM OF LOST PROFITS WITH RESPECT TO GENO'S

■ The Geno's situation stands alone because, on the date of exclusion, Vendor did not have in force one of its standard "Location Agreements" providing that Vendor might install machines on such premises for any fixed term of weeks, months or years. The fact that defendants may have acted arrogantly, abruptly, rudely, surreptitiously and in a manner that totally offends ordinary sensibilities could not substitute for the lack of a contract which might be breached. Certainly, this is the rule pertaining to an action for breach of contract. *See Title Ins. Co. of Minnesota v. Dean, Ludka, Harrison & Johnson, P.C.*, 616 S.W.2d 683, 684 (Tex.Civ.App.— Corpus Christi 1981, no writ). With respect to the tort theories of interference and conspiracy, the identical rule is gener-

ally applicable. *Armendariz v. Mora*, 553 S.W.2d 400, 405 (Tex.Civ.App.—El Paso 1977, writ ref'd n.r.e.). Reprehensibility, standing alone, will not create an action for tortious interference or for conspiracy. In order to invoke those torts, a plaintiff must go further and show that the conduct complained of was unlawful. Subject to rare exceptions not urged in this case, there must be in existence an enforceable contract and the contract must be breached, else those tort actions will fail for want of the element of unlawfulness in the actions of the defendant or defendants. *See Bellefonte Underwriters Ins. Co. v. Brown*, 663 S.W.2d 562, 573 (Tex.App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.). Finding that no contract existed which obligated any defendant to utilize Vendor's machines in this club for any fixed period of time, we hold that the machine installation agreement between the parties was a relation at will; defendants were free to call upon Vendor to remove its machines at any time. Stripped of opprobrious language, defendants did no more; Vendor may not recover for lost profits pertaining to Geno's.

Lacking one of its standard location agreements with respect to Geno's, Vendor relies on the quoted provision in the premises lease running between defendants Furrh and MJR and urges that it is a third-party beneficiary thereof. By implication, the trial court made findings that Vendor was a third-party beneficiary of the Furrh–MJR lease agreement.[9] However, we do not agree.

■ Before presenting our findings, we address the standard of review to be applied. There were no pleadings of ambiguity with respect to the Geno's lease

---

7. In view of the fact that the case must be remanded for re-trial, we omit discussion of most of the contentions concerning the alleged factual insufficiency of the evidence. We expressly do not reach Furrh's points 2, 4, 6, 8, 10, 12, 14, 16, 18, 20, 22, 24, 30 and 32 and MJR's points 3, 5, 7, 9, 11, 13, 20, 22, 24, 26, 30 and 32.

8. Furrh points 3, 15, 17, 21, and 31; MJR points 4, 6, 8, 10, 21, 23, 25, and 33.

9. By its finding of fact no. 1, the trial court held that Vendor "had the contractual right to exclu-

sive placement of coin-operated ... machines for terms of years at the ten clubs listing them by name." Finding no. 10 held that MJR "breached its contracts" in allowing machines to be removed. By conclusion of law no. 22, the court again found that MJR "breached its contracts" in allowing machines to be removed. The court omitted to specifically address the situation with respect to Geno's or to expressly find that Vendor was a third-party beneficiary of any particular contract.

agreement. Where there is no pleading of ambiguity with respect to a contract, all questions relating to the interpretation thereof become questions of law for determination by the trier of the law rather than questions to be decided by the trier of fact. *See Reilly v. Rangers Management, Inc.,* 727 S.W.2d 527, 529 (Tex.1987); *see also Texas & P. Ry. Co. v. Citizens National Bank,* 126 S.W.2d 765, 767 (Tex.Civ.App.—Eastland 1939), *rev'd on other grounds,* 136 Tex. 333, 150 S.W.2d 1003 (1941), *cert. denied,* 314 U.S. 656, 62 S.Ct. 109, 86 L.Ed. 526. Where, as here, the facts are tried to the court without the assistance of a jury, we give to the trial court's fact findings the same deference that we would give to the same findings by a jury. *See Baker v. Baker,* 719 S.W.2d 672, 674–75 (Tex.App.—Fort Worth 1986, no writ).

■ On the other hand, trial court findings upon the law are not given any particular deference. The appellate court, as the final arbiter of the law, not only has the power, but the duty to independently evaluate trial court findings upon the law. *See Harry Hines Medical Center, Inc. v. Wilson,* 656 S.W.2d 598, 603 (Tex.App.—Dallas 1983, no writ). Ambiguity not having been pleaded and interpretation having become a legal question, we have independently interpreted the Furrh–MJR lease agreement pertaining to Geno's and hold that no enforceable third-party beneficiary agreement was created.

## THE AUTHORITIES DO NOT SUPPORT THE CLAIM TO THIRD–PARTY BENEFICIARY STATUS REGARDING THE GENO'S CONTRACT

A frequently cited summary of the law pertaining to third-party beneficiary claims is contained in *Republic National Bank v. National Bankers Life Insurance Co.,* 427 S.W.2d 76 (Tex.Civ.App.—Dallas 1968, writ ref'd n.r.e.) (mortgage lender addressed commitment letter to property owner agreeing to make long term mortgage loan upon completion of construction; bank, allegedly relying upon lender's commitment, agreed to make "interim" construction loan; bank later sued mortgage lender for repudiating commitment letter, alleging that owner secured it for purpose of assuring bank that interim loan would be repaid on completion and that bank was therefore a third-party beneficiary; summary judgment for lender affirmed):

> [Bank] argues that the contract, while made between two other parties, was really executed for its benefit and that the parties so intended. It also argues that parol evidence concerning usage and custom is admissible to illuminate the true intention of the parties to the written contract.
>
> . . . .
>
> Parties are presumed to contract for themselves and it follows that a contract will not be construed as having been made for the benefit of a third person unless it clearly appears that such was the intention of the contracting parties.
>
> . . . .
>
> Beneficiaries of contracts to which they are not parties are divided into three classes: (a) donee beneficiaries, (b) creditor beneficiaries, and (c) incidental beneficiaries; and only those falling within the first two categories may enforce contracts made for their benefit.
>
> An incidental beneficiary, one who will be benefited only incidentally by the performance of the contract, cannot maintain an action thereon; an incidental beneficiary acquires, by virtue of the promise, no right either against the promisor or the promisee.
>
> Where a stranger contends that it was intended that the provisions of a contract should inure to his benefit such intention must be clearly apparent. If there is any doubt concerning the intent in this regard as it appears from the contract itself, such doubt should be construed against such intent.
>
> The law of usages and customs in its relation to contracts is usually applied in the interpretation of the agreements of the parties. It is said that the chief *office of a custom is to* determine the intention of the parties in connection with matters as to which the contract is not clear and explicit. But where a con-

tract is clear and complete, new terms cannot be added by incorporating a usage or a custom. In other words, usage or custom cannot operate to vary or contradict the terms of a plain and unambiguous contract, either expressly or by implications.

*Id.* at 79–80 (citations omitted). Mississippi courts were quoted as follows:

[T]he controlling principle of law here involved is that one not a party to a contract can sue for a breach thereof only when the condition which is alleged to have been broken was placed in the contract for his direct benefit. A mere incidental beneficiary acquires by virtue of the contractual obligation no right against the promisor or the promisee.

*Id.* at 81.

It follows that we must find a *clear intent* to contract for a *direct benefit* to Vendor. If there is any reasonable doubt as to an intent to confer a direct benefit, the third-party beneficiary claim must fail.

It is true that the language contained in the Geno's premises lease (quoted above) is rather pointed. However, there is no basis to hold that Vendor was a donee beneficiary. We have before us a business transaction. Although the parties had done business for a number of years and were cordial, perhaps even friendly, up to this time, there are no circumstances from which it is possible to infer a donative intent, as an elderly widower might cause a prenuptial agreement with his intended "sunset" bride to provide that she shall execute a will in favor of the widower's children of an earlier marriage. In our case, Vendor must prevail, if at all, as a so-called creditor beneficiary.

In this context, a creditor beneficiary may be defined as a third person to whom the bargain-seeking party (the "promisee" or contract party exacting the particular stipulation) has an indebtedness, contractual obligation, or other legally enforceable commitment to the third party which commitment the bargain-seeker wishes to discharge or protect by stipulating that the bargain-giver (the opposing contract party or "promisor" concerning the particular stipulation) shall deliver a contract performance to the third party.

The contract language under analysis failed to identify the bargain-seeker, but, by logic, it was defendant Furrh. He was the lessor; upon demising the premises, he would have had no control over the identity of the coin-machine contractor unless a stipulation were inserted in the lease. Conversely, defendant-lessee MJR, in the absence of the lease provision in issue, would have been free to deal with whomever it chose.

Having identified defendant Furrh as the bargain-seeker, we next must inquire as to the existence of an indebtedness, contractual obligation, or other legally enforceable commitment running between defendant Furrh and Vendor which he, Furrh, was clearly intending to discharge or protect by securing the contractual undertaking of MJR with respect thereto. Suffice to say, the record suggests none.

We are further disinclined to find a third-party beneficiary agreement by reason of the failure of the parties to spell out the terms of the performance being imposed upon defendant MJR. The duration of Vendor's asserted "right to place all vending machines" was nowhere spelled out. Vendor contends that it was granted this right for the entire fifteen-year life of the lease, but there was no express provision to this effect. Vendor's expert based his lost profits estimate regarding Geno's ($415,-560, almost one-third of the entire lost profits estimate) upon almost fifteen years of vending rights at such club. The trial court, by taking the expert's calculation, deducting a flat forty percent and entering judgment for the remainder, implicitly held that Vendor had nearly fifteen years of contractual rights at Geno's.

The lease also did not spell out the royalties to be paid by Vendor. Vendor apparently takes the position that it was obligated to pay the usual royalties, meaning the royalties stipulated in the "Location Agreements" for the other nine premises. Vendor's expert assumed that the same royalty rates were in effect at all locations. But inspection of those "usual" location agree-

ments reflects original contract lives far less than fifteen years. Vendor's position is mutually self-destructive. It argues that the royalty rates for Geno's are to be determined by looking at location agreements for other clubs; it denies that we should determine the life of its machine installation rights at Geno's through reference to those other location agreements.

An even greater problem in finding a third-party beneficiary contract is the fact that there was no provision whatever as to what, if anything, Vendor would be obligated to do. Each of the location agreements in evidence, at least by implication, contractually obligated Vendor to supply all of the club operator's reasonable coin-machine requirements, utilizing good quality machines; it was further obligated to service and maintain such machines in a reasonable manner. Nowhere did the alleged third-party beneficiary provision expressly so provide. Literally reading from the face of the instrument sued upon, Vendor was free for an entire fifteen years to supply or not supply machines, to remove any or all of them as it chose, leaving Geno's with insufficient machines or no machines at all—MJR all the while being forbidden to secure machines from any other source— Vendor being free to come and go at whim for the entire life of the lease. Even further, if Vendor had possessed the temerity to argue that it was "granted the right" for fifteen years "to place all ... machines" at Geno's without the slightest obligation *to pay any royalties whatsoever*, one would have been forced to concede that absolutely nothing within the four corners of the document called for the payment of any royalties at all. Of course, a no-royalty contention would have been completely untenable; the relationships and the course of dealing between the parties totally rebuts the notion that there was any intent to bestow any such largess upon Vendor.[10] The point to be made, however, is that when we examine the course of dealing between the parties, little is to be found to

indicate that, upon this occasion, defendant Furrh was possessed of any desire or intent, while entering into a lease with defendant MJR, to discontinue the machines-at-will arrangement then in effect at Geno's and to instead bestow upon Vendor the beneficent security of a long-term exclusive-rights contract in return for royalties and other obligations of Vendor to be governed by the whim of Vendor, limited, to some extent, by custom and practice.

To the contrary, the relationships and course of dealing between the parties indicates that defendant Furrh would have preferred to continue the machines-at-will arrangement, at least until defendant Furrh felt the need for financing, when he would have been possessed of an extra inducement to persuade Vendor to make a loan, to-wit, an exclusive-rights contract at the very profitable location called Geno's. It follows that relationships and course of dealing indicate that in entering into a lease of the Geno's premises with defendant MJR, Furrh was dealing for himself, rather than Vendor.

 In an effort to put flesh upon the obvious insufficiencies of the disputed lease provision, Vendor would argue that, by implication, the same obligations contained in the standard location agreement were all carried forward into the third-party beneficiary contract (but it would strenuously deny that the five-year term printed into its standard location agreement is applicable). The argument fails to recognize that *the courts will not create a third-party beneficiary contract by implication. See Texas Bank & Trust v. Lone Star Life Ins. Co.*, 565 S.W.2d 353, 357 (Tex.Civ.App.— Tyler 1978, no writ). The obligation must be clearly and fully spelled out or enforcement will be denied. The presumptions are against rather than in favor of third-party beneficiary agreements. *Republic*, 427 S.W.2d at 80. Where all or most of the terms of the contractual obligation must be implied from custom or from other dealings

---

10. On the same analysis, we again reject Vendor's donee-beneficiary contentions; the record is bereft of any evidence of clear intent, as required in order to sustain a third-party benefi-

ciary claim, that Furrh desired to bestow upon Vendor the substantial gratuity of fifteen years of exclusive machine placement rights.

of the parties, no enforceable obligation will be found.

Since *Republic,* 427 S.W.2d at 76, four other reported cases have involved attempts by third parties to recover upon mortgage commitment letters. *Knight Construction Co. v. Barnett Mortgage Trust,* 572 S.W.2d 381 (Tex.Civ.App.— Houston [14th Dist.] 1978, writ ref'd n.r.e.); *Texas Bank & Trust Co. v. Lone Star Life Ins. Co.,* 565 S.W.2d 353 (Tex.Civ.App.— Tyler 1978, no writ); *Exchange Bank & Trust Co. v. Lone Star Life Ins. Co.,* 546 S.W.2d 948 (Tex.Civ.App.—Dallas 1977, no writ); *Briercroft Savings & Loan Assoc. v. Foster Financial Corp.,* 533 S.W.2d 898 (Tex.Civ.App.—Eastland 1976, writ ref'd n.r.e.). Each appellant contended that the terms and the negotiations in its case presented a stronger claim for third-party beneficiary status than *Republic.* However, each was rejected; a clear intent to confer a direct benefit must be shown.

There are many reported cases involving the claim of a right to recover as a third-party beneficiary. Each must be studiously analyzed for factual similarity or dissimilarity. This is an area where rules are comparatively simple to state but difficult to apply. Most of the cases prior to *Republic,* and some which are subsequent, do not discuss the three-part donee-creditor-incidental beneficiary test which appears to have originated in the RESTATEMENT (SECOND) OF CONTRACTS § 302 (1979). Where the case indicates a family relationship between bargain-seeker and the third party, or the circumstances otherwise indicate that bargain-seeker possessed philanthropic orientation with regard to the third party, recovery has generally been allowed. Where the bargain-giver has promised a performance which will discharge or protect an obligation running from bargain-seeker to the third party, recovery has generally been allowed. On the other hand, *where neither of these conditions have existed, the bulk of the cases have denied recovery.*

The mortgage assumption cases have generated much third-party litigation. Where an owner (O–1) executes a mort-gage or other lien agreement in favor of a mortgagee (M) and thereafter conveys to a second owner (O–2) reciting in his deed that O–2 assumes and agrees to pay M's balance, a true creditor beneficiary situation is presented; recovery will uniformly be allowed. The problem arises from the "broken chain" cases where O–1 conveys to O–2 reciting that O–2 has taken subject to but not assuming M's lien and O–2 thereafter conveys to O–3 reciting that O–3 has assumed the indebtedness. In such instance, O–2 has no legal obligation to protect. However, the assumption agreement may protect O–2's credit standing, at least with M, if not with the community in general. Where the obligation is clear, the courts have allowed broken chain enforcement by M. *Allen v. Traylor,* 212 S.W. 945, 947 (Tex.Comm'n App.1919, opinion adopted). However, where the obligation is not clear and unequivocal, enforcement will be denied.

There are two leading cases denying enforcement. *Banker v. Breaux,* 133 Tex. 183, 128 S.W.2d 23 (1939) (O–2, having no personal liability, entered into "wrap around" mortgage with O–3 contracting that "[O–2] agree[s] to pay [M's debt] as it matures; upon failure to do so, ... [O–3 is] given the right to pay same" and take credit upon the "wrapper" note; held, no third-party recovery by M against O–2); *Casey v. Watts,* 130 S.W.2d 396 (Tex.Civ. App.—Waco 1939, writ dism'd) (O–2, having no personal liability, conveyed to O–3— when O–3 expressed concern that M's note was a lump sum note soon due, the terms of which O–3 would be unable to meet, O–2 delivered to O–3 a contemporaneous letter stating that O–2 would "take up" the indebtedness and allow O–3 to make monthly payments; held, when read "in light of the attendant facts," it was not the purpose of O–3, in extracting a promise from O–2, to make a gift to M "or to confer ... a right against" O–2—hence, M may not recover his debt from O–2).

One of the early third-party cases was *House v. Houston Waterworks Co.,* 88 Tex. 233, 31 S.W. 179 (1895) (Defendant contracted with city to lay mains and deliver water at specified pressures considered by

the parties adequate to fight fires—plaintiff brought suit contending his property destroyed by fire because of failure to maintain the contract pressure; held, "neither party intended that the water company should be obligated to the citizen," pointed out that city would have no liability had it supplied municipal water, concluded that private company had no greater obligation; hence, no recovery).

A similar case of more recent date is *Suthers v. Booker Hospital District*, 543 S.W.2d 723 (Tex.Civ.App.—Amarillo 1976, writ ref'd n.r.e.) (medical student contracted with scholarship fund to practice in small town for ten years, contract further providing it to be "contemplated" that bonds would be sold and a clinic constructed—after receiving scholarship and achieving license, student failed to stay; jury verdict that student's promise intended for benefit of plaintiff class of taxpayers overturned, new doctor not liable, on third-party beneficiary theory, for losses on construction). *Suthers* included the following pertinent observations:

> Absent any ambiguity in the contract, ... it is elementary that its construction is a question of law for the court....
>
> [A] contract will not be construed as having been made for the benefit of a third party ... unless it clearly appears such was the intention of the contracting parties.
>
> ....
>
> [T]he intention of the contracting parties is ... construed ... in the light of the attending circumstances, ... there being the presumption that the parties embodied their entire agreement in the written instrument....
>
> [P]rior opinions, construing as they do agreements of widely differing terms, offer no precedents but only assist in analysis; the determination of the parties' intention must depend upon the particular circumstances of each case.
>
> ....
>
> *[T]he agreement ... contains no language definitively stating that the agreement made by the contracting parties shall inure to the benefit of third parties....*
>
> [C]laimants argue that the contracting parties expressed the intent to benefit directly [the taxpayer class].... The agreement contains no language stating that such was the intent of the contracting parties.... [Without such a provision, a plaintiff class must] go further and show that by the language of the entire agreement, as it reflected the attending circumstances, the contracting parties manifested the intention that the third party beneficiary claimants would have a right to ... medical services ... for ten years if they constructed the medical facility.
>
> When the language of the entire agreement is considered in connection with the circumstances out of which it arose, it seems clear that the contracting parties had no intention of making the claimants third party beneficiaries.
>
> ....
>
> [T]here is no expression of any terms or conditions under which the ... [new doctor] would be permitted, much less required, to use the facility.... [T]here is no suggestion that anyone ... would be entitled, ... to demand medical services ... [from him.]
>
> [T]o accept the contention of ... claimants requires the holding that the intention to make the claimants third party donee beneficiaries was *so clearly within the contemplation of the contracting parties that they deemed it unnecessary to express it, and, therefore specifically omitted to express it.* That holding would be at variance with the language used....

*Id.* at 727–29 (emphasis added). *House*, 31 S.W. 179, was expressly relied upon by the concurrence.

A later case containing a valuable analysis of third-party beneficiary liability law is *Clearwater Constructors, Inc. v. Gutierrez*, 626 S.W.2d 789 (Tex.App.—San Antonio 1981, no writ) (in suit arising from on-the-job injury at government construction site; claimant contended defendant contractor liable on account of violation of

government safety regulations incorporated in contract; third-party beneficiary status denied).[11] *House*, 31 S.W. 179, was again relied upon. *Clearwater*'s primary shortcoming was its failure to distinguish, or even notice, an earlier opinion of the Supreme Court upholding liability in a similar situation.[12]

Admittedly, not all of the cases will fit a neat pattern. Witness the "broken chain" (*Allen*, 212 S.W. at 947), and the "humanitarian" exceptions (*James Stewart & Co.*, 149 Tex. 392, 233 S.W.2d 558 (1950)). The categorization of third-party beneficiary cases as donee-creditor-incidental should be expanded to include the "anomalous" third-party beneficiary cases, those where recovery is allowed, even though the claimant does not neatly fit the pattern, either as donee or creditor beneficiary.

■ Be that as it may, the exceptions do not swallow the rule. We find from the cases that we have reviewed a multiplicity of authority to the effect that unless the claimant can classify as a true donee-beneficiary or a true creditor-beneficiary (undertaking to discharge or protect bargain-seeker's obligation), third-party beneficiary recovery, subject to narrow exceptions, will be denied (1) unless the obligation of bargain-giver be fully spelled out, (2) unless it be unmistakable that a benefit to the third party was within contemplation of the primary contracting parties, and also (3) unless the primary parties contemplated that the third party would be vested with the right to sue for enforcement of the contract—all presumptions being invoked

against liability to the third party. We see no basis to bring Vendor within one of those narrow exceptions. Applying the teaching of the cases cited, including *Suthers*, we hold that the third-party beneficiary claim relating to the club known as Geno's must be denied.

## AN ALTERNATIVE INTERPRETATION OF THE GENO'S LEASE IS AVAILABLE AND MUST BE ADOPTED

We are not unmindful of the rule requiring that every contract provision must be given meaning, if such be possible. *E.g., Ogden v. Dickinson State Bank*, 662 S.W. 2d 330, 332 (Tex.1983) (on reh'g). Perhaps, this is the most troublesome aspect of the case in hand.[13] It fully illustrates the proposition that, simply because no one has pleaded ambiguity and because construction of the contract has, therefore, become a question of law, it does not assure that the contract is complete, precise and unmistakable in all of its terms. In seeking a solution to the problem of interpretation, we have weighed each of the following possibilities.

*First interpretation:* We note that the lease was drafted, in part at least, with the assistance of the officers and employees of Vendor. Quite possibly, the provision was gratuitously inserted by Vendor in the hope that the contract parties would consider it unobjectionable and would proceed to sign rather than offend a long standing business associate and potential source of financing. We do not further pursue the proposition because even if we so find, it could not affect our construction of the

11. *Accord* with respect to third-party liability concerning public construction contract, *see Knox v. Ball*, 144 Tex. 402, 191 S.W.2d 17 (1946).

12. *James Stewart & Co. v. Law*, 149 Tex. 392, 233 S.W.2d 558 (1950) (general contractor, in construction contract, agreed to purchase liability insurance and require that all subcontractors do so—subcontractor, having failed to insure, injured plaintiff; held, suit may be maintained against general contractor on third-party beneficiary theory). "If it be assumed that the motive of ... [owner] *was only the selfish one* to protect itself ..., it does not follow that it did not intend to benefit third parties." *Id.* 233 S.W.2d at 561 (emphasis added). We view the case as

an anomaly, applicable, out of humanitarian and public policy considerations, only to situations where construction contractors agree to purchase personal injury liability insurance.

13. The cases discussed above support the proposition that we must adopt a construction which does not create a third-party beneficiary liability, if we can reasonably do so. Even further, adopting the third-party beneficiary claim would do little to relieve the problem of construction. As pointed out, we are still troubled by the inability to find any debt or other obligation that bargain-seeker Furrh was seeking to discharge or protect; we are further troubled by the inability to clearly define the obligations incurred by bargain-giver MJR.

instrument. Parties are presumed to have read and understood all agreements which they have signed. *See Elick v. Schiller,* 235 S.W.2d 494, 496 (Tex.Civ.App.—Galveston 1950), *rev'd on other grounds,* 150 Tex. 363, 240 S.W.2d 997 (1951). There are no pleadings of fraud or mistake.

*Second interpretation:* We might conclude that defendant Furrh was proceeding on the mistaken assumption that Vendor already held an operative location agreement upon the Geno's premises. If so, it could be concluded that the provision in question was inserted, at Furrh's instance, for the purpose of requiring defendant MJR to perform his (Furrh's) obligation. In short, the provision may be interpreted as a contractual provision that MJR must comply with Furrh's preexistent coin-machine contract. In such instance, the covenant would be a protective agreement only which would not create any new rights in Vendor's favor. The interpretation is difficult to accept, and we decline to do so because MJR was already in possession of the premises and had been for some period of time. It is difficult to see how Furrh could have concluded that he had any liability to Vendor that required protection.

■ *Third interpretation:* Another possible interpretation is that bargain-seeker Furrh was imposing upon bargain-giver MJR a contract requirement that MJR enter into one of Vendor's standard location agreements. Facially, such interpretation is most plausible. However, seven months went by and neither Vendor nor bargain-seeker nor bargain-giver took any steps to implement any such agreement. Bear in mind that Vendor's officers were not only present from the inception of this lease; they drew or at least assisted in the drafting of it. Why did they fail to follow through for seven months? Furthermore, the lease was prepared and executed at the offices of Vendor. Vendor must have had a supply of its printed form location agreements close at hand. If it was the intent of bargain-seeker Furrh to require bargain-giver MJR to sign one of Vendor's standard forms, why did the parties so desiring not cause one of those forms to be filled

out and signed simultaneously with the lease itself?

In construing the legal effect of this lease provision, we cannot consider the negotiations and discussions of the parties and their privies; we can and do consider the relationships and surrounding circumstances. *See Van Horn Irrigated Farms v. Leonard,* 295 S.W.2d 516, 519 (Tex.Civ. App.—El Paso 1956, no writ). The fact that bargain-seeker Furrh did not cause the logical further step to be taken—of requiring MJR to simultaneously execute a standard location agreement—a step that could have been performed at the slightest effort —implies that he did not intend to require MJR to do so. The fact that Vendor, which stood to gain a substantial financial advantage from the execution of a location agreement, omitted the simple step of filling out and contemporaneously presenting this printed form for signature operates as a concession that Vendor did not consider that bargain-seeker Furrh was bargaining for an agreement that was legally enforceable in the hands of Vendor. In other words, Vendor, by its failure to then and there present a location agreement to MJR for signature, has conceded by implication that the legal right to demand that MJR sign such an agreement was not conferred upon it.

■ The very essence of the position as so-called "creditor beneficiary" requires not only that the bargain-seeking party intend to confer a benefit upon the third party; *he must further intend that the third party have the right to enforce the agreement. See Suthers,* 543 S.W.2d at 727. Unless both intents were exhibited on his behalf, the third party remains no more than an incidental beneficiary.

Our final reason to reject the interpretation that the lease provision was a contractual commitment by MJR to execute a standard location agreement with Vendor arises from the conduct of the parties *after* the lease was signed. We focus upon the conduct of Vendor because it had the most to gain. Seven months elapsed. Vendor continued to maintain its machines upon the premises at Geno's, continued to ser-

vice them and continued to pay royalties. Never did it ask MJR to sign one of its standard location agreements. It is hard to explain this omission away as simple oversight. Out of Vendor's failure to secure or even ask for the execution of a standard location agreement, we find a tacit admission by Vendor that bargain-seeker Furrh had not conferred upon it the enforceable right to require MJR to execute one of those instruments.[14]

██ *Fourth interpretation:* Another possibility is that the parties contemplated that the lease provision, in and of itself, was a sufficient contract to define Vendor's rights. We reject this interpretation for several reasons. First, it was contrary to the established course of dealings between the parties. In every other instance, at all nine of the other clubs, Vendor had sought and had obtained from defendants a complete definitive agreement for the installation of Vendor's machines. However, at Geno's, Vendor had been, prior to the execution of the disputed premises lease, willing to have its machines on location without formal agreement. Possibly this was because it was one of the more popular clubs and the machine revenues were higher. Quite likely, there was more competition from other coin-machine operators for the Geno's location. The marketplace may have forced Vendor to install its machines at Geno's under less favorable terms and conditions that Vendor was willing to accept elsewhere.

Just as the installation-at-will arrangement at Geno's was not new, the operation was not new. Defendant MJR had been operating under some type of rental arrangement with defendant Furrh for a considerable length of time. The record suggests no reason why Furrh, the lessor and the party in the most favorable bargaining position, would have suddenly desired to substitute a coin-machines-for-five-years, much less a coin-machines-for-fifteen-years arrangement, for a coin-machines-at-will arrangement. If he did desire to enter into a coin-machine contract for a term of years, why did he leave the life of the agreement to conjecture?[15]

If bargain-seeker Furrh was, indeed, intent upon requiring MJR to sign up with Vendor, with no apparent return benefit to Furrh (the machines were already on location at Geno's and had been there for some time on an at-will basis), it defies reason to suppose that he would not have gone forward and required the execution of a definitive contract spelling out the term of years, the royalty rate and the correlative obligations of Vendor.

The situation is identical from the point of view of bargain-giver MJR, if not even stronger. If it were committing for a term three times as long as it had ever committed before, would it not have demanded

---

**14.** Defendants argue that Vendor abandoned any legally enforceable right that it possessed to require MJR to sign a standard location agreement through inaction. *See Hancock v. Bradshaw*, 350 S.W.2d 955 (Tex.Civ.App.—Amarillo 1961, no writ). It further argues that the primary contract parties may revoke a third-party beneficiary agreement before it is acted upon. *See Rau v. Modern Sales & Service Inc.*, 414 S.W.2d 203 (Tex.Civ.App.—San Antonio 1967, writ ref'd n.r. e.). Vendor counters that the primary contract parties may not act in a manner that will defraud the beneficiary. *See Pacific American Gasoline Co. v. Miller*, 76 S.W.2d 833, 845 (Tex.App.—Amarillo 1934, writ ref'd). Vendor has again confused reprehensibility with unlawful conduct. Inasmuch as Vendor had not accepted the hypothetical contract commitment to execute a location agreement form, the primary contract parties were free to revoke the beneficiary's grant. The fact that defendants surreptitiously organized a competitor company before proceeding may have been offensive and unfair, but the test is unlawfulness, not unfairness. Inasmuch as we have rejected the interpretation that the contract provision was a promise by MJR to execute a location agreement, we need not further explore these matters.

**15.** Vendor's position is that the life of the machine location agreement was not left to conjecture; it was co-terminous with the fifteen year life of the grant, but the argument proves too much. Why would these club owners and operators, being in a particularly favorable bargaining position with respect to Geno's, be willing to commit themselves to a fifteen-year contract whereas they had not usually previously committed for more than five years at locations producing only a quarter or a third as much revenue?

that Vendor do as it had always done before, execute a definitive agreement which, at least spelled out the royalty rate? The failure of the parties to define their agreement, as they had done at every other location, leads to the conclusion that, with respect to this busiest of locations, the parties did not intend to follow the established procedure of entering into a long-term machine agreement with none of the obligations of Vendor spelled out in writing. We reject the interpretation to the effect that the parties considered the simple lease provision, in and of itself, to be an adequate machine-installation contract.

*Fifth interpretation:* We prefer another construction. For a number of years, defendant Furrh had filled most, if not all, of his coin-machine requirements through Vendor. From time to time, he had obtained financing, plus advice and assistance from Vendor. He wished to maintain that relationship, at least for the time being; he did not desire it to be jeopardized at that time. We insert the qualifications "for the time being" and "at that time" because defendant Furrh had already taken overt steps to set up New Vendor and to go into competition with Old Vendor. However, his plans were incomplete. It would be several more months before he would be in a position to overtly break relations with Vendor; in all likelihood, a possibility then existed that defendant Furrh's plans for New Vendor would not come to fruition.

■ Vendor's machines were already in place at Geno's on an at-will basis. *Defendant Furrh wished to continue this arrangement until New Vendor was ready to take over.* For such reason, defendant Furrh bargained into the lease agreement with lessee and co-defendant MJR a provision prohibiting MJR from doing business with anyone other than Vendor, at least not without Furrh's consent. In other words, Furrh as lessor desired to preserve his amicable business relationship with Vendor. He, therefore, inserted the provision *for his own protection, not for the protection of Vendor.* In effect, lessor Furrh was stipulating that MJR could not enter into a coin-machine contract with anyone other than Vendor *without prior consent of lessor Furrh.* Furrh was bargaining for the benefit of Furrh, not for the benefit of Vendor; therefore, Vendor acquired no right to enforce the lease provision. Having so interpreted the disputed lease provision, we hold that the contract parties were free to modify their agreement. Vendor was, at most, an incidental beneficiary.

In summary, we hold that the trial court erred in its necessarily implicit conclusion of law to the effect that Vendor was a third-party beneficiary of the premises lease between defendants Furrh and MJR relating to Geno's.

Vendor was not a donee beneficiary because the relationship between defendant Furrh and Vendor was a business relation. Vendor does not qualify as a creditor beneficiary. Defendant-lessor Furrh had no debt or legal obligation to Vendor which he might have been requiring defendant-lessee MJR to discharge or protect. Under such circumstance, *any benefit that might have come to Vendor from the disputed lease position would have been a windfall benefit.* For such reason, we are required to construe the lease provision against the existence of an enforceable right unless the writing, interpreted in light of the circumstances and relations of the primary contract parties, clearly and unmistakably manifested an intent on the part of bargain-seeker, defendant Furrh, to confer upon the third party, plaintiff Vendor, such an *enforceable* right.

It follows that the court erred in holding that Vendor was possessed of an enforceable, exclusive and non-cancellable right to install and maintain coin-machines at Geno's for the period of fifteen years, or any other fixed period of time. To the contrary, defendant-lessor Furrh was only contracting for his own benefit to the effect that defendant-lessee MJR could not terminate the then existing machines-at-will agreement with Vendor, unless MJR obtained the prior consent of defendant Furrh. We further hold that the trial court erred in awarding damages for the removal of Vendor's machines from Geno's; Vendor

held no enforceable contract rights pertaining to such location; Vendor was not damaged by the peremptory removal of its machines.

## THE CLAIM OF THIRD PARTY BENEFICIARY STATUS REGARDING THE BABY DOLLS LEASE MUST ALSO FAIL

As stated under "Facts," during July 1983, defendant Furrh, as lessor, executed two premises leases, both for terms of fifteen years, in favor of defendant MJR Corporation and an affiliate corporation, as lessees, covering two clubs—one known as Geno's and one known as Baby Dolls. Both the leases were prepared and signed on the same day at the offices of Vendor with the assistance of its officers and employees. Each lease contained an identical provision declaring that Vendor "is granted the right to place all ... coin operated machines on these premises." Immediately above, we have held that the provision in the Geno's lease did not vest in Vendor any enforceable rights as a third-party beneficiary. We now make the same ruling with respect to the Baby Dolls lease.

The situation with respect to the premises known as Baby Dolls was somewhat different. One year previous, on July 8, 1982, defendant MJR had executed one of Vendor's standard location agreement forms, granting to Vendor the exclusive right "of installing and operating coin-operated machines" on the Baby Dolls premises for a period of five years. Thus, Vendor already had machine placement rights at Baby Dolls during July 1983, when defendant Furrh executed his lease agreement in favor of defendant MJR's affiliate. The question which we must decide is whether the July 1983 lease agreement operated to vary or modify the July 1982 machine location agreement. Vendor contends that the lease provision vested in it a new contract term of fifteen years beginning with the July 1983 execution date. We hold that it did not.

██ Parties are presumed to contract for themselves; a contract will not be construed as having been made for the benefit of a third person unless such an intention clearly appears. *Republic,* 427 S.W.2d at 79. In order to recover, a third party must establish himself either as a donee-beneficiary or a creditor-beneficiary. *Republic,* 427 S.W.2d at 80. The anomalous beneficiary causes represent a narrow exception to the rule. Where there is any doubt, the contract will be interpreted as not having been made for the benefit of a third party. *House,* 31 S.W. at 181.

██ All of the surrounding circumstances will be considered. *Casey,* 130 S.W.2d at 398. Wherever the parties fail to spell out the complete terms of the supposed obligation of the bargain-giver toward the third party, recovery will be denied. *Suthers,* 543 S.W.2d at 727. Applying these rules, we interpret the Baby Dolls lease provision in a manner parallel to, but not identical with, our interpretation of the Geno's lease. We hold that the Baby Dolls lease provision was an acknowledgment, not a renewal, change, or modification of the underlying machine location agreement that had been executed in favor of Vendor. The lease did no more than acknowledge the existence of that agreement with Vendor. The lease provision is directly comparable to deed recitals declaring that the property being conveyed is subject to a previously executed lease, a previously executed easement, or a previously executed lien. In such instance, the grantor of the deed is not to be construed as having undertaken to enlarge the rights of the holders of any of those underlying grants. Deed recitals of prior grants are to be construed as mere acknowledgments of their existence. There can be no claims of nondisclosure where such encumbrances are recited in the conveyance. In the present instance, defendants Furrh and MJR will be construed as doing no more than reciting that, on the lease execution date in July 1983, the property was already subject to a machine location agreement in favor of Vendor.

Under the above caption, "Facts," we have noted that Vendor's expert testified, on the basis of an assumed unexpired term of 688 weeks, that Vendor had sustained a

discounted loss of profits in the amount of $394,205. We hold that when Vendor's machines were excluded during February 1984, Vendor was only possessed of unexpired machine location rights for a further term of 164 weeks.

■ Anticipating that its claim to recover for fifteen years' of lost profits with respect to the Baby Dolls lease might not be sustained, Vendor caused its expert to give alternative testimony as to the discounted lost profits that might arise from the July 1982 machine location agreement. The expert testified to lost profits for the unexpired term of the machine location agreement in the amount of $102,370. As we read the record, and as we have interpreted the trial court's findings, the trial court ruled that Vendor had fifteen-year machine location rights at both Baby Dolls and Geno's, and it assessed damages on this basis. In doing so, the court erred. In view of the considerations to be discussed below, we cannot cure this error by simply modifying the judgment, even though Vendor placed alternative lost profit calculations in evidence. The recovery of damages with respect to Baby Dolls must be set aside pending a new trial.

## NO RECOVERY MAY BE HAD WITH RESPECT TO THE THREE CLUBS OPERATED BY CIRCLE W, INC.

The Circle W agreements present yet another difficulty. Vendor pleaded and placed in evidence three machine location agreements relating to three clubs known respectively as "Babe's," "Fantasy Island," and "Cuddles." The Cuddles agreement was dated June 8, 1982, and the other two agreements were dated September 15, 1983. Each was signed by defendant MJR or its principals, defendants Murphy and Woodruff, and each was for a term of five years. Vendor's expert testified as to lost profits through the end of the respective five-year terms on the basis of an assumption that each of these agreements was valid and enforceable. In its findings of fact and conclusions of law, the trial court agreed. We hold that the court erred in this respect.

Defendants called Steve Webb, the principal of Circle W, Inc., who testified that during the months prior to the exclusion, his company, together with a sub-lessee of his company, was operating each of these three premises (apparently as a sub-lessee from MJR et al.), that with respect to each of these three locations, the royalties were not being paid to MJR or its principals, but that they were being paid to Circle W, Inc. Defendant Woodruff also testified to this effect. Through Webb's testimony, defendants placed in evidence executed machine location agreements between Circle W, Inc. and Vendor relating to Babe's and Fantasy Island, each dated prior to the location agreements relied upon by Vendor and each still within its five-year term as of the date of exclusion. Webb further testified without controversion that he had also executed a machine location agreement with Vendor relating to Cuddles. Vendor's local manager confirmed that location agreements had been signed with Circle W. An officer of Vendor conceded that during the period of time immediately prior to the exclusion, royalties were being paid to Circle W. Vendor's royalty payment records, as placed in evidence, showed that the royalties were being paid to Circle W. Thus, the uncontroverted evidence reflects that Vendor never paid royalties to defendant MJR or its principals under the machine location agreements that were sued upon and which pertained to these three premises under discussion.

■ We hold that Vendor cannot recover damages with respect to machine location agreements which Vendor never honored and never paid royalties upon.

It is fundamental that whenever one party to a contract commits a material breach, the other party, at its election, is excused from further performance. *Board of Regents of the University of Texas v. S & G Construction Co.*, 529 S.W.2d 90, 97 (Tex. Civ.App.—Austin 1975, writ ref'd n.r.e.). The Supreme Court considered the question in *Mead v. Johnson Group, Inc.*, 615 S.W. 2d 685, 689 (Tex.1981) (sale of real estate business—as part of consideration, defendant buyer promised "override" [share of

future gross commissions received by firm] to seller—seller contracted to remain in employ of the business but left after buyer failed to pay):

> ... [Buyer] argues that it was error to award ... [seller] commissions and overrides because her breach excused performance by ... [buyer].... [Buyer] breached the contract to pay ... on March 1, 1976.... [Seller] was in compliance with the contract until March 24, 1976.... Default by one party excuses performance by the other party.

*Id.* at 689 (citations omitted). *See also Jack v. State*, 694 S.W.2d 391 (Tex.App.— San Antonio 1985, writ ref'd n.r.e.):

> [I]t is fundamental when one party to a contract repudiates or commits a material breach of that contract, the other party is discharged or excused from his obligation to perform. [Citations omitted] Accordingly, ... failure to continue payments under the "services agreement" was excusable and cannot be considered as a termination or breach.

*Id.* 398–99. *See also Corso v. Carr*, 634 S.W.2d 804, 808 (Tex.App.—Fort Worth 1982, writ ref'd n.r.e.) (buyer of house refused to close unless builder agreed to pay discount points needed to obtain buyer's financing; buyer later relented and sought to close but meanwhile builder had sold to another customer; buyer's judgment against builder and new customer reversed):

> [W]hen ... [buyer failed to pay the full purchase price], he breached the contract, thus excusing performance on the part of [builder]. It is fundamental that when one party to a contract repudiates or commits a material breach ... the other party is ... excused from his obligation.

The situation with respect to the three clubs under discussion is rather bizarre, but we find no dispute as to the facts. Circle W, Inc., either directly or through its sub-lessee, was in possession and was operating Babe's, Fantasy Island, and Cuddles. Vendor had effective machine-location agreements with Circle W respecting each of those premises.

Subsequently, Vendor entered into machine-location agreements with respect to each of these three premises with defendant MJR and its principals. However, it is undisputed that Vendor continued to pay the royalties on all three locations to Circle W and paid no royalties under the new machine location agreements to the "lessors" named in those new agreements. The only explanation offered by the record for this rather unorthodox situation was presented by defendants. According to the testimony of defendant Woodruff, each of the machine-location agreements relating to the three clubs under discussion was executed in connection with a loan which defendant MJR received from Vendor. He testified that whenever Vendor made loans, it required the execution of machine-location agreements. According to the witness, Vendor explained that it wished to "spread" its loans among numerous machine-location agreements; and, according to the witness, Vendor required execution of machine-location agreements with respect to properties with which defendant MJR had no connection. Supposedly this arrangement was necessary to satisfy a "mother company." Vendor's officers conceded that it was their practice to obtain location agreements on all club locations in which an applicant had an interest whenever Vendor made a loan. Thus, it appears that Vendor secured additional location agreements covering Babe's, Fantasy Island, and Cuddles from MJR and its principals as a form of security for a loan to MJR.

Whatever may have motivated Vendor to obtain machine-location agreements from defendant MJR and its principals is not material. The material fact is that Vendor never honored those location agreements, never paid the royalties called for therein. Instead, it continued to pay all royalties to Circle W pursuant to the terms of pre-existing location agreements. Vendor may not have damages relating to the breach of contracts which it never honored. The trial court's award of damages with respect to Babe's, Fantasy Island, and Cuddles must

be set aside.[16]

## RESTRAINT OF TRADE WAS NOT CONCLUSIVELY PROVED

Defendants attack the machine-location agreements as illegal restraints of trade.[17] They argue that the Coin Operated Services Law [18] prohibits a person from securing a coin-machine location through commission of "any act prohibited by the penal laws of this State." Defendants further contend that such prohibition incorporates section 15.05(a) of the Texas Business and Commerce Code declaring that every "contract ... in restraint of trade of commerce is unlawful." Defendants point out that substantially the same language appears in the Sherman Act (15 U.S.C.A. § 1) and argues that the federal courts have found "tying arrangements" to be within the purview of Sherman's parallel provision. Premised on the foregoing interpretation of the law, which we do not necessarily adopt, defendants attack Vendor's habit of securing machine-location agreements in connection with the making of loans as an illegal tying arrangement.[19]

■ Illegality of contract is a defensive issue to be pleaded and proved by the defendant. *Kahn v. Harris, Upham & Co.,* 247 S.W.2d 139, 142 (Tex.Civ.App.—San Antonio 1952), *aff'd,* 151 Tex. 655, 253 S.W.2d 647 (Tex.1953). Plaintiff contends that the claim of illegality was not properly raised in the trial court. However, the trial court entered broad findings of no illegality and the plaintiff did not object to the form

thereof; arguably, the issue was tried by consent.

■ We assume, without deciding, that our Texas courts will look to federal court interpretations of the federal antitrust laws in the interpretation of our own similarly worded statutes. Defendants fail to recognize that not every tying arrangement is an *illegal* tying arrangement. An illegal tying arrangement has five elements: (1) a tying (the product desired by the customer) and a tied product (which the customer is forced to take as part of the package); (2) actual coercion by the seller that in fact forced the buyer to purchase the tied product; (3) the seller must have sufficient market power in the tying-product market to force the buyer to accept the tied product; (4) there are anticompetitive effects in the tied market; and (5) the seller's activity in the tied product must involve a not insubstantial amount of interstate commerce. *See Amey Inc. v. Gulf Abstract & Title, Inc.,* 758 F.2d 1486, 1502–03 (11th Cir. 1985), and cases cited therein. If only a single purchaser is "forced" to purchase a tied item, the impact on competition would not be sufficient to warrant the concern of antitrust law. Tying arrangements are not condemned unless a substantial volume of commerce is foreclosed. *See Jefferson Parish Hospital Dist. No. 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 1560, 80 L.Ed.2d 2 (1984). An actual, substantial and material restraint of trade must be shown. Without a showing of actual adverse effect on competition, defendants cannot make out a

**16.** We are not to be construed as holding that defendants did not induce the breach of the machine-location agreements between Circle W, Inc. and Vendor. Neither do we hold that Vendor may not recover damages with respect to such agreements. What we do hold is that the judgment before us cannot be upheld upon any such theory; Vendor neither pleaded nor presented evidence in support of any claim against defendants for inducing breach of the Circle W location agreements.

**17.** Furrh, points 25 through 28; MJR, points 16 through 19.

**18.** TEX.REV.CIV.STAT.ANN. arts. *8801–8817* (Vernon Supp.1986).

**19.** Defendants only attack the location agreements relating to four clubs on restraint of

trade grounds: Babe's, Cuddles, Fantasy Island, and Showtime. Presumably, they so limit their attack because the evidence only shows these four machine-location agreements to have been extracted from defendant MJR as an express condition imposed by Vendor upon the making of a loan. Although the evidence indicated that defendant uniformly required the execution of location agreements in connection with the making of a loan, defendants presented no evidence that any other location agreement was executed as part of the price of obtaining a specific loan. Obviously, one situation does not necessarily follow the other; merely showing the execution of a location agreement does not prove that any loan whatever was involved.

case under the antitrust laws. *Id.* 104 S.Ct. at 1568.

 Defendants presented evidence that they borrowed money from Vendor from time to time. It was acknowledged that Vendor was in the habit of asking for location agreements from those to whom it made loans, including defendants. It was not shown, however, that Vendor refused to make any specific loan unless a specific location agreement were signed. For Vendor to follow the practice of loaning money to clubs where its machines were located or to clubs where its machines were to become located produced an obvious beneficial side effect for Vendor. The prospective patronage, or increase of patronage, that the parties anticipated would result from the expenditure, would also increase the machine revenues conferring a valuable benefit upon Vendor. It was entitled to loan or expend its funds in a manner that promised to increase its machine revenue unless it conducted its lending activities in a manner that resulted or threatened to result in an actual restraint of trade.

No actual restraint of trade was proved; certainly not to the extent that we would be authorized to set aside the trial court's findings of no illegality. Defendant MJR failed to show that it tried to get any specific loan elsewhere and was unable to do so. It does not contend that it was unable to rent or lease machines from another vending machine company on better terms, without the requirement that it sign location agreements. Defendant made no showing that Vendor dominated the market for vending machine rentals in Dallas, or any other relevant area, through its practice of making loans available to those who patronized Vendor in its basic capacity as a coin-machine company. Lacking clear and substantial evidence that any restraint of trade resulted or was threatened, the illegality of contract points must be overruled.

---

20. Other matters relating to this appeal are being addressed in a separate opinion that will not be published. Tex.R.App. 90.

---

For the reasons stated, this case is REVERSED and REMANDED for new trial.[20]