TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-99-00130-CV







Michael J. Yuchnitz d/b/a My Econo $39.95 Optical, Appellant



v.



PCA Health Plan of Texas, Inc. and Block Vision of Texas, Inc., Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT


NO. 98-04771, HONORABLE MARY PEARL WILLIAMS, JUDGE PRESIDING








 Michael J. Yuchnitz sued appellees PCA Health Plan of Texas, Inc. ("PCA") and
Block Vision of Texas, Inc. ("Block Vision") for failure to include his retail optical stores in
PCA's health provider network. The trial court granted summary judgment in favor of appellees. 
We affirm the judgment of the trial court.


FACTUAL AND PROCEDURAL BACKGROUND

 Yuchnitz is an optician. During the period relevant to this lawsuit, Yuchnitz owned
and operated approximately ten retail optical stores in Bexar County under the names My Econo
Optical and My Econo $39.95 Optical. PCA holds a certificate of authority from the Texas
Department of Insurance to operate as a health maintenance organization under chapter 20A of
the Texas Insurance Code. See Tex. Ins. Code Ann. art. 20A.03-.06 (West 1981 & Supp. 2000). 
PCA creates managed care networks to provide health care services to patients who are members
of its plan.

 On April 23, 1996, PCA contracted with the Texas Department of Health
("Department") to participate in the State of Texas Access Reform Medicaid Managed Care
Program ("STAR program"). The STAR program was created by the Texas Legislature in the
early 1990s to provide quality health care to the state's Medicaid population at a reasonable cost,
primarily through the coordination of health care services by for-profit health maintenance
organizations. To this end, in May of 1995 the legislature adopted Senate Bill 10, which
authorized the Texas Health and Human Services Commission to undertake a comprehensive
restructuring of the Texas Medicaid program. See Act of June 13, 1995, 74th Leg., R.S., ch.
444, § 1, 1995 Tex. Gen. Laws 3129 (Tex. Rev. Civ. Stat. Ann. art. 4413(502), §§ 16A-16G,
since repealed). As part of the restructuring process, managed care pilot programs were
implemented in Bexar County and several contiguous counties ("Service Area"). (1) 

 The Department chose PCA as one of three health maintenance organizations
responsible for providing managed care services to qualified and eligible Medicaid recipients in
the Service Area. The 1996 contract between PCA and the Department states that the purpose of
the agreement is to "promote coordination and continuity of preventive health services, primary
care and other medical services and behavioral health services." The contract requires PCA to
"maintain a viable provider network in the Service Area" to provide contracted health services,
and to include in the network "significant traditional providers," as defined by the Department,
that meet certain credentialing requirements. The Department defines "provider" in its
administrative rules as "[a]n individual or entity and its employees and contractors that provide
health care services to members under the state's Medicaid managed care program"; "significant
traditional provider" ("STP") is defined as "[a] provider with whom Medicaid recipients have
well-established or longstanding provider/client relationships, or to whom the recipients have
typically or traditionally gone for health care or family planning advice." 25 Tex. Admin. Code
§ 30.22 (1999).

 In September 1996, Yuchnitz sought admission to PCA's provider network. PCA
referred Yuchnitz to Block Vision, a subcontractor retained by PCA to determine whether optician
providers met the minimum credentialing requirements of the STAR program. Yuchnitz
completed Block Vision's "Optician Enrollment Application" on September 10, 1996. On the
application form, Yuchnitz indicated that he was a Medicaid provider. On October 3, 1996,
Block Vision informed Yuchnitz that PCA's provider network was closed.

 On August 29, 1997, PCA entered into a second contract with the Department to
provide health care services to Medicaid recipients in the Service Area. The 1997 contract
required PCA to include STPs in its provider network "for at least three (3) years from the
implementation date of this contract." After the second contract had taken effect, Yuchnitz again
sought admission to PCA's provider network. (2) On September 12, 1997, following a conversation
with Yuchnitz, Block Vision sent Yuchnitz a credentialing information update and requested
information Yuchnitz had failed to submit with his initial application, including evidence of
professional liability insurance and a written description of the affiliation between Yuchnitz and
various doctors of optometry. Before submitting all of the requested information, Yuchnitz
learned from the Department of his designation as an STP for the Service Area. In October 1997,
Yuchnitz fully complied with Block Vision's requests for information, and Block Vision admitted
him to PCA's provider network in November 1997. 

 Yuchnitz sued PCA and Block Vision for breach of contract and related torts based
upon his position that, because he was an STP, PCA was obligated by the terms of its two
contracts with the Department to include him in its provider network when he first applied for
admission in September 1996. Yuchnitz argued that he was an intended third-party beneficiary
of the contracts entered into between PCA and the Department, and that PCA's failure to include
him in its network until November 1997 constituted a breach of those contracts. Yuchnitz filed
a motion for partial summary judgment on these grounds.

 PCA also filed a motion for partial summary judgment, which Block Vision
adopted in its entirety, contending that Yuchnitz lacked standing to pursue contractual remedies
because he was merely an incidental third-party beneficiary of the contracts at issue. The trial
court granted summary judgment in favor of PCA and Block Vision as to Yuchnitz's breach of
contract claims. Yuchnitz nonsuited his remaining claims by amending his pleading; thus, the trial
court's partial summary judgment became a final, appealable judgment. See Mafrige v. Ross, 866
S.W.2d 590, 592 (Tex. 1993). On appeal, Yuchnitz challenges the summary judgment granted
in favor of appellees and requests that summary judgment be granted in his favor and that the case
be remanded to the trial court for a determination of damages.

DISCUSSION

 When both parties move for summary judgment and the trial court grants one
motion and denies the other, the reviewing court should review the summary judgment evidence
presented by both sides and determine all questions presented. See Bradley v. State, 990 S.W.2d
245, 247 (Tex. 1999) (citing Commissioners Court v. Agan, 940 S.W.2d 77, 81 (Tex. 1997));
Jones v. Strauss, 745 S.W.2d 898, 900 (Tex. 1988). The reviewing court should render the
judgment that the trial court should have rendered. See Agan, 940 S.W.2d at 81; Members Mut.
Ins. Co. v. Hermann Hosp., 664 S.W.2d 325, 328 (Tex. 1984). 

 Summary judgment is proper only if the summary judgment proof establishes that
there are no genuine issues of material fact and that the movant is entitled to judgment as a matter
of law. See City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 675-79 (Tex. 1979). 
On appeal from a summary judgment, we take the evidence favorable to the non-movant as true
and indulge every reasonable inference in favor of the non-movant. See Nixon v. Mr. Property
Management Co., 690 S.W.2d 546, 548-49 (Tex. 1985). 

 The first issue we must address on appeal is whether the trial court erred in
granting summary judgment in favor of PCA and Block Vision, thereby denying Yuchnitz relief
based on his contention that he was an intended third-party beneficiary of the two contracts
entered into by PCA and the Department. If we conclude that summary judgment was improperly
granted because Yuchnitz was an intended third-party beneficiary of the contracts at issue, we
must then determine whether Yuchnitz established as a matter of law that the contracts were
breached. 

 A third party may recover on a contract made between other parties only if the
parties intended to secure some benefit to that third party, and only if the contracting parties
entered into the contract directly and primarily for the third party's benefit. See Thomson v.
Espey Huston & Assoc., Inc., 899 S.W.2d 415, 418 (Tex. App.--Austin 1995, no writ). In
determining whether a third party can enforce a contract, the intention of the contracting parties
is controlling. See MCI Telecommunications Corp. v. Texas Utils. Elec. Co., 995 S.W.2d 647,
651 (Tex. 1999) (citing Corpus Christi Bank & Trust v. Smith, 525 S.W.2d 501, 503-04 (Tex.
1975)). A court will not create a third-party beneficiary contract by implication. See M.J.R.
Corp. v. B&B Vending Co., 760 S.W.2d 4, 11 (Tex. App.--Dallas 1988, writ denied). The
intention to confer a direct benefit to a third party must be fully and clearly spelled out or
enforcement by the third party must be denied. See id. Consequently, a presumption exists that
parties contracted for themselves unless it "clearly appears" that they intended a third party to
benefit from the contract. See Smith, 525 S.W.2d at 503-04. Any doubts are resolved against
the finding of a third-party beneficiary. See Thomson, 899 S.W.2d at 418 (citing Dorsett Bros.
Concrete Supply, Inc. v. Safeco Title Ins. Co., 880 S.W.2d 417, 421 (Tex. App.--Houston [14th
Dist.] 1993, writ denied)). 

 Only intended beneficiaries may recover on a contract. See Republic Nat'l Bank
v. National Bankers Life Ins. Co., 427 S.W.2d 76, 80 (Tex. Civ. App.--Dallas 1968, writ ref'd
n.r.e.). Intended beneficiaries can be grouped into two classes: donee beneficiaries and creditor
beneficiaries. See MCI Telecommunications Corp., 995 S.W.2d at 651; see also 4 Corbin on
Contracts, § 774 (1951); 1 Williston on Contracts, § 356 (3d ed. 1959). One is a donee
beneficiary if the purpose of the promisee in obtaining the promise is to make a gift to the
beneficiary, or to confer upon the beneficiary a right against the promisor to some performance. 
See Brunswick Corp. v. Bush, 829 S.W.2d 352, 354 (Tex. App.--Fort Worth 1992, no writ); 1
Williston on Contracts, § 356. If, on the other hand, the beneficiary receives the performance in
satisfaction of a legal duty owed him by the promisee, he is a creditor beneficiary. See Bush, 829
S.W.2d at 354; 4 Corbin on Contracts, § 774; 1 Williston on Contracts, § 356. 

 If the benefits of a contract to a third party are merely incidental to the performance
of the promise, and the third party is neither a donee nor a creditor beneficiary, then the third
party is an incidental beneficiary. See Republic Nat'l Bank, 427 S.W.2d at 80; Restatement
(Second) of Contracts, §§ 302, 315 (1979). Incidental beneficiaries acquire no rights against
either the promisor or the promisee by virtue of a promise. See Republic Nat'l Bank, 427 S.W.2d
at 80; Restatement (Second) of Contracts, § 315.

 Yuchnitz does not contend that he is a creditor beneficiary of the contracts between
PCA and the Department; thus, in order to have standing to sue on the contracts, he must qualify
as a donee beneficiary. The intent of the contracting parties to directly benefit Yuchnitz must be
evident from the language of the contract. See Bush, 829 S.W.2d at 354 (citing Greenville Indep.
Sch. Dist. v. B & J Excavating, Inc., 694 S.W.2d 410, 412 (Tex. App.--Dallas 1985, writ ref'd
n.r.e.)). In determining intent, we must examine the contract in its entirety, and all of its
provisions must be considered and construed together. See Esquivel v. Murray Guard, Inc., 992
S.W.2d 536, 543 (Tex. App.--Houston [14th Dist.] 1999, pet. denied). We must presume that the
parties contracted only for themselves and not for the benefit of third parties, unless the obligation
to the third party is clearly and fully spelled out. See Bush, 829 S.W.2d at 354. 

 Yuchnitz argues that one provision in each of the lengthy and complex agreements
between PCA and the Department demonstrates their intent to contract for the benefit of STPs,
a class to which he undisputably belongs. We will consider the two contracts separately,
analyzing each to determine whether the parties contracted directly and primarily for his benefit. 
See Thomson, 899 S.W.2d at 418-20. The relevant provision in the 1996 contract states that:


[PCA] shall maintain a viable provider network in the Service Area to provide
contracted medical and behavioral health services to Members in each county in
the Service Area. [PCA's] primary care network shall include appropriate ratios
of providers with credentials and/or experience in pediatric and adolescent care to
the enrolled child and adolescent STAR population. [PCA] shall include
significant traditional providers as defined by [the Department] in its provider
network. [PCA] shall ensure that physician services provided to Members are paid
for at rates sufficient to ensure that provider participation and services are as
available to the STAR population as to the general population in [PCA's] Service
Area. 



(Emphasis added.) Yuchnitz contends the italicized provision is a clear and succinct expression
of the parties' intent to directly benefit third-party STPs. We disagree.

 The provision in the 1996 contract relied upon by Yuchnitz must be read in light
of the paragraph in which it is found, as well as the contract as a whole. (3) The contract's preamble
states that the Department 


desires to enter into a risk comprehensive Contract with [PCA] to provide managed
care Contract services to Members who are enrolled in [PCA] under the STAR
program in the Service Area defined below in order to promote coordination and
continuity of preventive health services, primary care and other medical services
and behavioral health services.




"Member" is defined as any individual residing in the Service Area who is enrolled in the STAR
program. "Continuity of care" refers to services by a member's primary care provider or
specialist, which includes "all necessary preventative care, primary health care, referral to
speciality care, and coordination of other health-related and behavioral services." Thus, the
preamble evidences the contracting parties' clear intent to benefit Medicaid patients in the Service
Area who are enrolled in the STAR pilot program. 

 Likewise, the paragraph containing the requirement that PCA "include" STPs in
its provider network, when read as a whole, describes certain contractual duties that PCA must
carry out in order to ensure that adequate health care services are available to eligible members. 
The paragraph's provisions are consistent with the stated purpose of the contract, the delivery of
health care services to Medicaid patients, and the limited reference to STPs in one sentence of the
paragraph cannot be read so broadly as to confer on all STPs in the Service Area a right to sue
for breach of contract. (4) See Esquivel, 992 S.W.2d at 543 (citing MJR Corp., 760 S.W.2d at 11)
(describing difficulty of inferring donative intent in a business transaction). The contracting
parties' alleged intent to confer a direct benefit upon the STPs is not spelled out in terms sufficient
to overcome the presumption that PCA and the Department contracted for their own purposes. 
Yuchnitz, as an STP, is at best an incidental beneficiary of the 1996 contract between PCA and
the Department, and as such, may not recover on the contract. See MCI Corp., 995 S.W.2d at
651 (reference to class of licensees in contract between MCI and railroad not sufficient to confer
upon class member rights of intended third-party beneficiary). 

 The 1997 contract between PCA and the Department provides even less support
for Yuchnitz's claim that he is an intended third-party beneficiary than the 1996 agreement. (5) 
Unlike the 1996 agreement, the 1997 contract contains several provisions describing the nature
of the relationship between PCA and STPs. The first such provision, and the one on which
Yuchnitz relies, states in full:


[PCA] must include significant traditional providers in its provider network to
provide primary care and speciality care services. [PCA] must include STPs in its
provider network for at least three (3) years from the implementation date of this
contract.



The next three provisions require that STPs accept PCA's standard reimbursement rate, satisfy
PCA's credentialing requirements, and agree to requirements contained in other sections of the
contract in order to gain admission into the provider network. The final two provisions describing
the relationship between PCA and STPs provide that: 


[PCA] must demonstrate a good faith effort to include STPs in its provider
network. [PCA's] compliance with the [Department's] good faith effort
requirement for STPs must be reported using report requirements defined by [the
Department]. [PCA] must submit quarterly reports documenting [PCA's]
compliance with [the Department's] good faith effort requirement for STPs.


Failure to demonstrate a good faith effort to meet [the Department's] compliance
objectives to include STPs in [PCA's] provider network, or failure to report efforts
and compliance . . . are defaults under this contract and may result in any or all
of the sanctions and remedies included in Article XVII of this contract.



 When read together and considered as part of the overall document, these various
provisions do not establish that PCA and the Department contracted directly and primarily for the
benefit of the STPs. By the express terms of the contract, PCA is obligated to admit into its
provider network only those STPs that meet its credentialing requirements. The contract does not
hold PCA strictly liable for failure to include a qualifying STP in the network; rather, PCA must
only demonstrate that a good faith effort was made to meet the Department's compliance
objectives. If PCA fails to demonstrate that such an effort was made, the contract provides the
Department--not the third-party STPs--with an elaborate choice of remedies, including termination
of the agreement. This remedy allows the Department to sever ties with PCA if PCA's actions
jeopardize the Department's stated purpose for contracting-- to "provide comprehensive health care
services to qualified and eligible Medicaid recipients." 

 Having reviewed the two contracts in their entirety, and having considered and
construed all of their provisions together, we conclude that the contracting parties did not enter
into the contracts directly for the benefit of STPs like Yuchnitz. Instead, the contractual
provisions reflect the intention of the Department to facilitate the delivery of health care services
to Medicaid recipients by requiring PCA to give providers to whom recipients have traditionally
gone for health care the opportunity to participate in their health care networks. Because Yuchnitz
was at best an incidental beneficiary of the contracts, the trial court did not err in granting
summary judgment in favor of PCA and Block Vision. We affirm the judgment of the trial court
without deciding whether appellees breached their agreements with the Department by not
including Yuchnitz in the network until November 1997.



 


 Jan P. Patterson, Justice

Before Justices Jones, B. A. Smith and Patterson

Affirmed

Filed: January 6, 2000

Do Not Publish
1. The Service Area consists of Bexar County and the contiguous counties of Atascosa,
Comal, Guadalupe, Kendall, Medina, and Wilson.
2. The record indicates that Yuchnitz did not correspond with Block Vision from
October/November 1996 until September 1997.
3. The 1996 contract consists of ten articles spanning seventy-four pages. Eight appendices
are attached to the contract.
4. According to the "Texas Medicaid Managed Care Significant Traditional Provider List,"
which was provided to Yuchnitz by the Department, there are thousands of STPs in the Service
Area. The list organizes the STPs by county into two major classes--"physicians" and "all other
providers"--and various sub-classes according to specialty. The record is silent as to how many
of these health care providers were actually involved in the pilot program.
5. The 1997 contract consists of eighteen articles spanning ninety-two pages. Twelve
appendices are attached to the contract.



rements contained in other sections of the
contract in order to gain admission into the provider network. The final two provisions describing
the relationship between PCA and STPs provide that: 


[PCA] must demonstrate a good faith effort to include STPs in its provider
network. [PCA's] compliance with the [Department's] good faith effort
requirement for STPs must be reported using report requirements defined by [the
Department]. [PCA] must submit quarterly reports documenting [PCA's]
compliance with [the Department's] good faith effort requirement for STPs.


Failure to demonstrate a good faith effort to meet [the Department's] compliance
objectives to include STPs in [PCA's] provider network, or failure to report efforts
and compliance . . . are defaults under this contract and may result in any or all
of the sanctions and remedies included in Article XVII of this contract.



 When read together and considered as part of the overall document, these various
provisions do not establish that PCA and the Department contracted directly and primarily for the
benefit of the STPs. By the express terms of the contract, PCA is obligated to admit into its
provider network only those STPs that meet its credentialing requirements. The contract does not
hold PCA strictly liable for failure to include a qualifying STP in the network; rather, PCA must
only demonstrate that a good faith effort was made to meet the Department's compliance
objectives. If PCA fails to demonstrate that such an effort was made, the contract provides the
Department--not the third-party STPs--with an elaborate choice of remedies, including termination
of the agreement. This remedy allows the Department to sever ties with PCA if PCA's actions
jeopardize the Department's stated purpose for contracting-- to "provide comprehensive health care
services to qualified and eligible Medicaid recipients." 

 Having reviewed the two contracts in their entirety, and having considered and
construed all of their provisions together, we conclude that the contracting parties did not enter
into the contracts directly for the benefit of STPs like Yuchnitz. Instead, the contractual
provisions reflect the intention of the Department to facilitate the delivery of health care services
to Medicaid recipients by requiring PCA to give providers to whom recipients have traditionally
gone for health care the opportunity to participate in their health care networks. Because Yuchnitz
was at best an incidental beneficiary of the contracts, the trial court did not err in granting
summary judgment in favor of PCA and Block Vision. We affirm the judgment of the trial court
without deciding whether appellees breached their agreements with the Department by not
including Yuchnitz in the network until November 1997.



 


 Jan P. Patterson, Justice

Before Justices Jones, B. A. Smith and Patterson

Affirmed

Filed: January 6, 2000